753 A.2d 793

COMMONWEALTH of Pennsylvania, Appellee,

v.

Ralph BOLDEN, Appellant.

Supreme Court of Pennsylvania.

Argued Sept. 14, 1999.

Decided June 20, 2000.

John Elash, Pittsburgh, for Ralph Bolden.

Michael W. Streily, Robert A. Willig, Pittsburgh, for Commonwealth.

Robert A. Graci, for Office of Attorney General.

Before FLAHERTY, C. J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## *OPINION OF THE COURT*

FLAHERTY, Chief Justice.

This is a direct appeal of appellant's 1996 conviction of criminal homicide, robbery, aggravated assault, recklessly endangering another person and theft by unlawful taking or disposition. The jury returned a sentence of death. On April 8, 1996, the court sentenced appellant to death on the homicide conviction, and three consecutive sentences of ten to twenty years for the robbery and aggravated assault convictions.

The facts established at trial are as follows. On June 30, 1994, at about 10:00 a.m., Michael Elder arrived at Valor Hi Adventure Shop, a sporting goods store in Baldwin Borough, where he worked. He saw two cars in the store parking lot, "a primer station wagon" and a car belonging to John Calabro, Elder's co-worker. As Elder approached the store, he noted that the door was open. When he went inside the store, however, it seemed as if something was wrong. He walked to the back of the store in order to put his lunch in the refrigerator and was confronted by appellant holding a chrome plated autoloading pistol pointed at his face. Within three seconds, appellant shot Elder in the face, knocking him unconscious, but not killing him.

Minutes later, two other customers arrived in the store and discovered not only Elder's body, but the body of John Calabro, who had been shot dead. Elder was conscious but unable to speak. The customers called for help. When police and paramedics arrived, Elder was taken to the hospital and Calabro's dead body was found in a kneeling position behind

the counter. Calabro had a single gunshot wound to the forehead with powder burns. The glass case containing guns was smashed. The store owner subsequently determined that several guns were stolen, including a number of handguns, a rifle and a shotgun. The handguns, including a Colt .380 pistol, were stored in the glass case without magazines.

Elder identified appellant at the preliminary hearing and at trial. Both Elder and the store owner identified appellant as a person who had been in the store on several previous occasions.

Reginald Brown, who had grown up with appellant, testified that appellant sold him a number of handguns for $1,500 in the summer of 1994. The serial numbers had been obliterated, but an expert was able to raise most of the obliterated serial numbers from these guns. These numbers were the same as those for the weapons stolen from Valor. Brown indicated that some of the guns he purchased from appellant, particularly the .380 Colt pistols, did not have magazines and appellant told Brown that he would get him magazines.

After the crime, police requested local gun stores to take notice of anyone purchasing magazines for handguns. Harry Moore, a manager of Braverman Arms Company in Wilkinsburg, testified that on July 13, 1994 appellant purchased two magazines for a Colt .380 pistol. Moore recorded appellant's driver's license at the time of the purchase.

An ATF agent testified that the only handguns registered to appellant at this time were two .380 caliber Lorsen pistols and a .40 caliber Niberia. No Colts were registered to appellant.

A firearms expert testified that he performed ballistic tests on bullets removed from Elder and Calabro. He determined with reasonable scientific certainty that they had been fired from the same .380 caliber Lorsen pistol. This pistol was recovered by police after the shooting and Harry Moore, of Braverman Arms, testified that appellant had purchased this gun on June 13, 1994. Brown testified that this Lorsen pistol was similar to one of the guns appellant sold him and which

he, Brown, gave to one Chris Williams to clean. Williams, in turn gave the gun to police.

Appellant owned two Lorsen .380 pistols and reported one of them stolen on June 15, 1994.

Thus, appellant purchased the Lorsen pistol used in the crime on June 13, 1994, shot the two victims with this gun on June 30, 1994, and sold the gun to Reginald Brown in the summer of 1994.

Blood stain analysis concluded that blood from the broken counter was consistent with appellant's blood and that Elder and Calabro were eliminated as being the source of this particular stain. Additional analysis of this blood by the manager of the DNA laboratory for the Pennsylvania state police in Greensburg indicated that the blood taken from the broken gun case matched the genetic profile of the blood of appellant.

Appellant did not testify, but presented a diminished capacity defense. Appellant's mother testified that appellant had been hospitalized twice before for mental disease. Dr. Bernstein, a psychiatrist, testified that he examined appellant on three occasions, and that his conclusion was that appellant was schizophrenic and was, for that reason, unable to form the specific intent required for first degree murder. He testified that appellant was unresponsive to powerful anti-psychotic drugs because of the severity of his condition, and that appellant heard voices which drove him to commit the crimes in question.

Over objection, the Commonwealth played a tape of a television interview which appellant conducted after his arrest in which he denied any participation in the crimes at issue.

In every case in which a death penalty has been imposed, this court is required to review the sufficiency of evidence for a conviction of first degree murder. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937, 942 n. 3 (1982). In considering sufficiency of evidence, this court must determine whether the evidence and all reasonable inferences

from the evidence, viewed in the light most favorable to the Commonwealth as verdict winner, are sufficient to enable the fact finder to establish all of the elements of the offense beyond a reasonable doubt. *Commonwealth v. Hall,* 549 Pa. 269, 701 A.2d 190, 195 (1997). As this court recently stated in *Commonwealth v. Koehler,* 558 Pa. 334, 737 A.2d 225, 233–34 (1999):

> To sustain a conviction for first degree murder, the Commonwealth must prove that the defendant acted with a specific intent to kill, that a human being was unlawfully killed, that the accused did the killing, and that the killing was done with deliberation. It is the specific intent to kill which distinguishes murder in the first degree from lesser grades of murder. We have held that the use of a deadly weapon on a vital part of a human body is sufficient to establish the specific intent to kill. Finally, the Commonwealth can prove the specific intent to kill through circumstantial evidence.

(Footnotes and citations omitted.)The presence of appellant's blood at the murder scene, the identification of appellant by Elder, appellant's possession and sale of firearms stolen from Valor Sports, and appellant's shooting of Elder when Elder walked in on the robbery are sufficient to establish that appellant acted with specific intent, premeditation and deliberation in killing Calabro during the course of a robbery.

▉ Appellant's first claim of error is that pre-trial counsel was ineffective in allowing appellant to conduct a television interview prior to the coroner's hearing. At this hearing, appellant denied being involved in the shooting, but at trial, his defense was diminished capacity. Appellant's theory of ineffectiveness is that by allowing appellant to conduct the television interview, which would be available for viewing by the jury and in which appellant denied any involvement in the crime, pre-trial counsel undermined the diminished capacity defense that would be presented at trial.

▉ As this court recently stated: "A criminal defendant sustains a claim of ineffectiveness of counsel by proving: (1)

that the underlying claim is of arguable merit; (2) that counsel's performance had no reasonable basis; and (3) that counsel's ineffectiveness worked to his prejudice." *Commonwealth v. Baez,* 554 Pa. 66, 720 A.2d 711, 733 (1998).

At the Capital Unitary Review And Death Penalty Cases Act hearing on April 10, 1997, which occurred a little more than a year after appellant was convicted of first degree murder, aggravated assault, robbery, theft and recklessly endangering another, appellant testified that he fabricated the entire diminished capacity defense.[1] He testified that when the forensic evidence indicated the presence of his blood at the scene of the shooting, he realized he needed a defense other than the denial that he was present:

Q. Did you not tell Dr. Bernstein [the defense psychiatrist] about pulling the trigger?

A. Not that I recall. I may have. You never can get the facts of your life straight, you know. In that gist, I don't want to say it is going to be hard for me to remember everything I told Dr. Bernstein because that whole thing was fabricated.

Q. The whole thing was fabricated?

A. The thing I told Dr. Bernstein was fabricated.

Q. How about Dr. Levitt when you told him he devil forced you to shoot Mr. Elwood?

A. Once again ...

Q. It was all fabricated?

A. Yes.

N.T. 58–59 (April 10.1997).

Q. At what point, sir, did you decide to fabricate this? Was there any particular point in time that you decided the mental defense would be the best?

A. Well, like I said, I didn't want a mental defense, but I had to think of something, and that's what I thought of.

---

1. By order of August 11, 1997 this court permanently suspended the Capital Unitary Review Act. *In Re Suspension of the Capital Unitary Review Act and Related Sections of Act No. 1995–32(SSI),* No. 224 Criminal Procedural Rules Docket No. 2.

It was right after I had that meeting with [trial counsel].
I started thinking—who is going to believe me. I could go
up there and scream my lungs out, but who was going to
believe me.

Q. The blood that was left at the scene was yours?

A. The blood that was there, they so-called tested that and
found it was mine and other things. I didn't know what to
do.

*Id.* at 60.

Appellant's claim, in essence, is that the lie he told the news
media undermined the lies he arranged to be told in court
through the manipulated testimony of his expert medical
witnesses. Such a claim is unsustainable. When it is certain,
as it is here, that appellant's claim boils down to the complaint
that counsel was ineffective in his handling of lies, we will not
even reach the question of ineffectiveness. Counsel, as a
matter of law, cannot be ineffective in his treatment of lies, for
the perversion of truth, of course, has no legitimate or accept-
ed place in litigation. The claim is without arguable merit.

Appellant's second claim of error is that trial
counsel was ineffective in not calling one Jewel Thomas,
appellant's lady friend, who would have testified, inter alia,
that appellant at times exhibited behavior consistent with
schizophrenia. In order to prevail on this claim, appellant
must not only meet the requirements for ineffectiveness of
counsel, set out above, but also he must meet an additional
five part test: he must be able to show (1) the witness existed;
(2) the witness was available; (3) counsel was informed or
should have known of the existence of the witness; (4) the
witness was available and prepared to cooperate and would
have testified for appellant; and (5) the absence of the testi-
mony prejudiced appellant. *Commonwealth v. Crawley*, 541
Pa. 408, 663 A.2d 676, 679–80 (1995).

This claim too fails for a number of reasons.
First, it fails because once again appellant complains that his
lawyer did not facilitate his lie. As we stated above, a lawyer
may not be found to be ineffective because he failed to

facilitate a defense based upon lies. But in addition, appellant's trial counsel testified that appellant ordered him not to call this witness during the guilt phase of the trial because he believed that her involvement would jeopardize her job. Trial counsel cannot be ineffective for failing to take a course of action which appellant forbade.

Finally, appellant argues that it was error for the trial court to instruct the jury that it could find as an aggravating circumstance that appellant knowingly created a grave risk of death to another person in addition to the victim of the murder.[2] 42 Pa.C.S. § 9711(d)(7). Citing *Commonwealth v. Paolello*, 542 Pa. 47, 665 A.2d 439 (1995), where this court stated that the aggravating circumstance of creating a grave risk to persons other than the murder victim "has been found by this Court in those instances where the other persons are 'in close proximity' to the decedent 'at the time' of the murder, and due to that proximity are in jeopardy of suffering real harm," 665 A.2d at 456, appellant asserts that Elder was not in the zone of danger created by the murder. "At an absolute minimum," appellant asserts, the Commonwealth must have shown that Elder could have been struck with the bullet that killed Calabro.

The evidence established that when Elder arrived at the store, appellant was already inside and that he shot Elder as Elder walked to the rear of the store. Elder did not see his co-worker Calabro as he entered the store, and the Commonwealth presented no evidence that Elder was nearby or within the zone of danger when Calabro was killed. Presumably, Calabro was already dead when Elder entered the store.

2. The jury found that two aggravating circumstances outweighed four mitigating circumstances. The aggravating circumstances found were that "the defendant committed a killing while in the perpetration of a felony" and that "in the commission of the offense the defendant knowingly created a grave risk of death to another person in addition to the victim of the offense." The mitigating circumstances found were that "the defendant has no prior criminal convictions;" "the defendant served in the armed forces;" "the defendant [did] average in school;" and "unrefuted expert testimony of mental predisposition."

On these facts, we are constrained to agree that it was error for the trial court to instruct the jury that it could find (d)(7) (creating a grave risk of death to another person in addition to the victim of the murder) as an aggravating circumstance.

■■ Because the jury found two aggravating circumstances and four mitigating circumstances, but one of the aggravating circumstances was erroneously determined, the penalty of death is vacated and the case is remanded for a new sentencing hearing pursuant to 42 Pa.C.S. § 9711(h)(3)(ii).[3]

Justice NIGRO concurs with the majority and files a concurring opinion in which Justice CAPPY joins. Justice CAPPY also joins the majority opinion.

Justice CASTILLE files a concurring and dissenting opinion.

NIGRO, Justice, concurring.

I concur with the Majority and write separately solely to address the position taken by Justice Castille in his Concurring and Dissenting Opinion that the trial judge did not err by instructing the jury that it could find the (d)(7) aggravating circumstance.

Justice Castille is accurate in stating that what we are concerned with here is the construction of a statute, namely 42 Pa.C.S. § 9711(d)(7). The (d)(7) aggravating circumstance applies when "[i]n the commission of the offense the defendant knowingly created a grave risk of death to another person in addition to the victim." 42 Pa.C.S. § 9711(d)(7). Justice Castille suggests that the word "offense" within this context should be interpreted to include more than just the defendant's murderous acts because the legislature did not use a more particular phrase such as "homicidal conduct" or "homi-

---

3. 42 Pa.C.S. § 9711(h)(3)(ii) provides:

(3) The Supreme Court shall affirm the sentence of death unless it determines that:

✳ ✳ ✳

(ii) the evidence fails to support the finding of at least one aggravating circumstance specified in subsection (d).

cidal acts" in crafting the aggravating circumstance at issue. Accordingly, Justice Castille contends that, for purposes of (d)(7), appellant's robbery of the sporting goods store constitutes an "offense" during the commission of which he placed a third person (Mr. Elder) in grave risk of death.

The statutory interpretation advocated by Justice Castille, however, defies logic because the only "offense" for which a defendant can be exposed to the possibility of facing the death penalty is first-degree murder. *See, e.g.,* 42 Pa.C.S. § 9711(a)(1). In addition, Justice Castille's proposed interpretation of the term "offense" within (d)(7) as referring to crimes other than murder is in contravention of the well-known canon of statutory construction that penal statutes must be construed strictly. *See* 1 Pa.C.S. § 1928; *Commonwealth v. Smith,* 528 Pa. 380, 385, 598 A.2d 268, 271 (1991).

As noted above, the (d)(7) aggravator applies only when the defendant knowingly creates a grave risk of death to another person in addition to the victim "in the commission of the offense." 42 Pa.C.S. § 9711(d)(7). As we clearly stated in *Commonwealth v. Paolello,* the (d)(7) aggravator is applicable only in those instances where "other persons are 'in close proximity' to the defendant 'at the time' of the murder." 542 Pa. 47, 80, 665 A.2d 439, 456 (1995). Thus, notwithstanding Justice Castille's argument to the contrary, the phrase "in the commission of the offense" plainly means "during the murder" or "at the time of the murder."

In the instant case, the Majority correctly concludes that there was insufficient evidence to support the Commonwealth's theory that appellant's fatal shooting of Mr. Calabro within the sporting goods store placed Mr. Elder in grave risk of death because there was simply no showing that Mr. Elder was put in danger at the time of Mr. Calabro's murder. To be sure, Mr. Elder was put in danger later, when appellant shot him—but that shooting simply did not occur "in the commission of the offense," i.e., *during Mr. Calabro's murder.* While Justice Castille correctly observes that (d)(7) does not apply only to cases were bystanders are located directly behind the

intended victim as that person is being shot,[1] I believe that it would undermine the plain meaning and unambiguous intent of the statute in question to find that (d)(7) applies to cases such as the instant one, where there is no indication that a third party was placed in grave risk of death during the murder of the intended victim due to that third party's temporal and spatial proximity to the victim.[2]

Justice CAPPY joins in the concurring opinion.

CASTILLE, Justice, concurring and dissenting.

While I agree that there was sufficient evidence to support appellant's murder conviction and that his counsel was not ineffective in the guilt phase of the trial, I disagree with the majority's holding that the trial court erred in instructing the jury that it could find as an aggravating circumstance that, in the commission of the offense, the appellant knowingly created a grave risk of death to another person in addition to the victim of the offense. 42 Pa.C.S. § 9711(d)(7). The majority concludes that there was insufficient evidence to support a finding of the § 9711(d)(7) aggravating circumstance on the basis that "the Commonwealth presented no evidence that Elder was nearby or within the zone of danger when Calabro was killed." Even more disturbingly, the majority cites with apparent approval appellant's argument that, at a minimum, the Commonwealth was required to show that the second victim, Elder, could have been struck with the bullet that killed Calabro in order for this aggravating circumstance to

1. *See, e.g., Commonwealth v. Robinson,* 554 Pa. 293, 721 A.2d 344 (1998) (murder of victim by multiple shootings creates grave risk to victim's girlfriend who is on floor in nearby room); *Commonwealth v. Counterman,* 553 Pa. 370, 719 A.2d 284 (1998) (murder of victims by house fire creates grave risk to other house members, neighbors and firefighters).

2. I therefore believe that the (d)(7) aggravator has no place in cases where the grave risk to a person other than the intended victim is substantially removed in time or space from the commission of the murder, such as in *Commonwealth v. Johnson,* 542 Pa. 384, 668 A.2d 97 (1995) (shooting murder in street creates grave risk of death to neighbor who pursued defendants by car for several blocks while they were shooting at him).

apply. In my view, the majority's construction of §. 9711(d)(7) ignores both the plain language of the statute and our case law interpreting it. Accordingly, I respectfully dissent from the grant of a new penalty hearing.

In determining that appellant did not create a grave risk of death to another person in addition to the victim, the majority focuses its inquiry on the instant that the killing shot was fired. The majority cites a single case, *Commonwealth v. Paolello*, 542 Pa. 47, 665 A.2d 439 (1995), in support of this focus. In *Paolello*, the Court surveyed cases decided under § 9711(d)(7) and noted that the circumstance had been found in those instances where the "other persons" put at grave risk were "in close proximity" to the decedent "at the time" of the murder "and due to that proximity are in jeopardy of suffering real harm." *Id.* at 80, 665 A.2d at 456. *Paolello* later extrapolated from the cases it surveyed a rule that this aggravating circumstance arises only in those factual situations where a "nexus exists connecting the 'other persons' to the zone of danger created by the defendant['s] actions in killing the victim." *Id.* at 82, 665 A.2d at 457.

Preliminarily, the broad rule suggested by the *Paolello* survey does not command any conclusion here because it was not necessary to the decision of that case. In *Paolello*, the defendant beat two men on October 3, 1991. One of the men went to the hospital and survived. The second man refused to seek treatment for his injuries and began ingesting large quantities of vodka that were administered to him by the defendant who said, "the only doctor your [sic] going to see is this vodka." *Id.* at 63, 665 A.2d at 447. Eighteen hours later, the second man died as a result of a combination of blunt force trauma and alcohol poisoning. No general rule was necessary to decide *Paolello*. The survivor in *Paolello* was never exposed to the alcohol poisoning that killed the decedent. The § 9711(d)(7) aggravating circumstance unquestionably did not apply.

More importantly, helpful though the survey in *Paolello* may be to a general understanding of the cases that have arisen under § 9711(d)(7), it does not end the matter of the

construction of the statute. Indeed, there is a line of cases, relied upon by the trial court and the Commonwealth, but ignored by the majority, in which this Court has held that there is sufficient evidence to support a finding of the § 9711(d)(7) aggravating circumstance when the defendant's behavior either *before* or *after* the act of killing created a grave risk of death to someone other than the victim.

For example, in *Commonwealth v. McNair*, 529 Pa. 368, 603 A.2d 1014 (1992), the defendant fatally shot the victim and, after dispatching him, fired several additional shots at a friend of the victim's who was attempting to flee. This Court dismissed the defendant's argument that the shooting of the victim's friend should be considered a separate offense for purposes of the (d)(7) aggravating circumstance, explaining that, "[b]ecause these shots were fired in such a short time and at specific people who were running for safety, the jury was justified in concluding that sufficient evidence exists for a finding that others were placed in grave risk of death during the commission of [the] murder." *Id.* at 376, 603 A.2d at 1018. Further, we held that the serious injuries sustained by the victim's friend "conclusively establish[ed] that he was put in grave risk of death by [defendant] during the murder." *Id.*

Similarly, in *Commonwealth v. Johnson*, 542 Pa. 384, 668 A.2d 97 (1995), we held that there was sufficient evidence to support the jury's finding of the § 9711(d)(7) aggravating circumstance in a case where, after the defendant fatally shot the victim six times, the defendant and his co-conspirators fired numerous shots from their getaway car at a man who was attempting to pursue them as they fled the murder scene. *Id.* at 393, 409, 668 A.2d at 101, 109.

This Court appears to have followed the reasoning of *Johnson* and *McNair* in *Commonwealth v. Robinson*, 554 Pa. 293, 721 A.2d 344 (1998). In *Robinson*, the defendant arrived at the apartment of his ex-girlfriend, Tara Hodge, and discovered that Hodge's current boyfriend was taking a shower in the bathroom. Hodge testified that the defendant pointed a gun at her and shot her in the front room of her apartment while her boyfriend was showering in the bathroom. Before she

lapsed into unconsciousness, she heard three shots in all and then the defendant ran past her. When she regained consciousness, she went into the bathroom where she discovered the dead body of her boyfriend in the shower stall; he had been shot seven times. Even though the defendant obviously murdered the victim *after* he had shot Hodge, and even though the victim and Hodge were not even in the same room at the time of either shooting, this Court held that there was sufficient evidence to establish the § 9711(d)(7) aggravating circumstance. *Id.* at 302, 314, 721 A.2d at 349, 355.

Finally, in *Commonwealth v. Mitchell,* 528 Pa. 546, 599 A.2d 624 (1991), the defendant and three runaways from the Children's Home of York returned to the Home to carry out a conspiracy to kill a counselor who, the conspirators had concluded, had been strict in his treatment of the juveniles. While three of the conspirators, including the defendant, stabbed the counselor to death, the fourth stood guard on the second floor, with instructions to kill anyone who woke up and attempted to help the victim. In fact, no one awoke, and the only person to suffer injury was the murdered counselor. Even though the victim was stabbed to death with no others in the vicinity, this Court held that the offense posed a grave risk of death "to the other residents of the home." *Id.* at 552, 555, 599 A.2d at 627–28.

Based on the theory espoused in these cases, there plainly was sufficient evidence to permit the jury here to consider the § 9711(d)(7) aggravating circumstance, even though the bullet that killed Mr. Calabro posed no specific danger to Mr. Elder and Mr. Elder was not shot until after Mr. Calabro was murdered. The killing of Mr. Calabro occurred in the course of appellant burglarizing the premises. At the time that Mr. Elder entered the store, appellant had yet to make his escape. I see no significant difference between appellant's shooting Mr. Elder in the face, to facilitate his getaway, and the shooting at pursuers in *Johnson,* or the separate shootings in *McNair* and *Robinson,* or the inchoate danger in *Mitchell.*

Furthermore, contrary to the majority, I believe that the conduct here warranted submission of the aggravating circum-

stance to the jury even under the zone of danger theory extrapolated from the case law by *Paolello.* The zone of danger was the store where appellant killed Mr. Calabro; that zone did not become safe until appellant escaped. As Judge Cercone noted:

> We believe that Mr. Elder unquestionably was within the zone of danger, and was in close proximity to the decedent at the time of the murder. Elder arrived at the store within minutes of its opening. Defendant, who had shot and killed Mr. Calabro, had not yet completed his robbery and getaway. Mr. Elder arrived within minutes o[r] perhaps seconds of Calabro's murder. The murderer/robber was still in the store. If Defendant was to succeed, complete his robbery and effect his escape from his vile deeds, he had to eliminate the only other person present, a co-worker who had arrived within minutes or seconds of Bolden's cold-blooded act. One last witness would need eliminat[ion] in order for defendant to make good on his escape. Unfortunately for Defendant, however, he failed to complete that task, leaving a witness who would help bring justice down upon him.

Trial Court Opinion at 10. I thoroughly agree with this analysis.

Further support for this understanding of the zone of danger test is provided in our recent decision in *Commonwealth v. Counterman,* 553 Pa. 370, 719 A.2d 284 (1998). In *Counterman,* the defendant murdered his three children by setting fire to his house and preventing their escape. We held that there was sufficient evidence to support the jury's finding of the § 9711(d)(7) aggravating circumstance because, by setting the fire, the defendant created a grave risk of death not only to his wife, who was also in the house, but also to firefighters and his neighbors, who were not. Obviously, by so holding, we recognized that, by setting the fire, the defendant created a zone of danger that remained not only until the blaze was extinguished, but also extending to individuals who entered this zone after the initial setting of the fire. Similar-

ly, in the instant case, the zone of danger remained until appellant made his escape from the store.

But even if it could be said that the rule *Paolello* found in its survey of earlier cases supported the result reached by the majority here, I would still dissent. We are concerned with the construction of a *statute*. The cases construing the statute are a testament only to the "factual situations" that generated them. *Paolello,* 542 Pa. at 82, 665 A.2d at 457. The mere happenstance that a majority of the cases that have arisen involve a certain type of "factual situation" does not mean that other fact patterns do not fall within the statutory rule. In other words, the case law cannot operate to amend the statutory language.

The plain language of § 9711(d)(7), no less than the case law cited earlier, fully supports the trial court's decision to submit this issue to the jury. The statutory aggravating circumstance in (d)(7) governs factual situations where, "In the commission of the *offense* the defendant knowingly created a grave risk of death to another person in addition to the victim of the *offense*." *Id.* (emphasis added). It is notable that the legislature employed the broad term "offense" for, elsewhere in the same statute, the legislature used narrower terms such as "a killing," 42 Pa.C.S. § 9711(d)(6), or "homicidal conduct" or "homicidal acts," § 9711(e)(6), (e)(7), in defining various aggravating and mitigating circumstances. Had the legislature intended to confine the grave risk of death aggravator to risks caused by the circumstances surrounding only the killing blow itself as the majority suggests, surely it would have employed one of the narrower terms it proved capable of employing elsewhere. By using the term "offense," rather than "killing" or "homicidal act," the statute requires that the (d)(7) inquiry should not be limited to the instant that the killing took place.

Finally, this case provides a prime example of the wisdom of this aggravating circumstance. Aggravating circumstances exist to provide the appropriate punishment for the most heinous of murders or murderers. Appellant's conduct here went well beyond that necessary to commit a first degree

murder. The "offense" was not simply the intentional shooting of Mr. Calabro, it was a robbery in which appellant displayed an easy willingness to kill anyone in his path. Appellant entered the sporting goods store at 10:00 a.m.—*i.e.*, at a time when it was open, and when other employees and customers were likely to enter. Indeed, the door to the store was left ajar. During the course of the robbery, appellant smashed a glass display case, shot Mr. Calabro in the head and left his body behind a counter in the front of the store. It was easily foreseeable, even likely, that someone would enter the store during the course of the robbery/murder, notice the smashed display case, look for employees and discover the body of Mr. Calabro before appellant could make his escape. Until that escape occurred, anyone who entered the store, such as Mr. Elder, was in grave danger. Thus, implicit in the offense appellant elected to commit was a grave risk of death to anyone else who might enter the sporting goods store. The second victim was such a person. This grave risk distinguishes this from other first degree murders. I believe it is precisely the type of aggravating circumstance contemplated by § 9711(d)(7). Accordingly, I dissent.