987 A.2d 699

**COMMONWEALTH of Pennsylvania, Appellee**

**v.**

**Lavar BROWN, Appellant.**

Supreme Court of Pennsylvania.

Submitted April 14, 2009.

Decided Dec. 29, 2009.

Bernard L. Siegel, Philadelphia, Lavar Brown, for Lavar Brown.

Amy Zapp, Hugh J. Burns, Jr., Philadelphia District Attorney's Office, Todd M. Mosser, for Commonwealth of Pennsylvania.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, GREENSPAN, JJ.

## OPINION

Justice EAKIN.

This is a direct appeal from a death sentence imposed after a jury convicted appellant of first degree murder, possession of an instrument of crime, and carrying a firearm without a license.[1] At the penalty phase, the jury found two aggravating circumstances and no mitigating circumstances. We affirm the first degree murder conviction and the sentence of death.[2]

---

1. 18 Pa.C.S. §§ 2502(a), 907(a), 6106.

2. Appellant does not challenge his convictions for the latter two crimes.

On December 10, 2003, appellant, then age 24, and Rahsaan Anderson were standing on Girard Avenue in Philadelphia, near a school, subway station, gas station, and restaurant. Around 3:00 p.m., appellant saw Robert Crawford crossing Girard Avenue, and stated, "There go that pussy." N.T. Trial, 5/26/05, at 33. Appellant approached Crawford and, without provocation, shot him multiple times in the back.

After shooting Crawford, appellant and Anderson began to run but were quickly deterred by two police officers in a patrol vehicle. One officer stopped and frisked Anderson, but found no weapon. The second officer saw appellant across the street with his right hand in his jacket pocket and ordered him multiple times to show his hands. Appellant refused to remove his hand from his pocket and instead ran back toward the crime scene and down an alley. The officer pursued him, commanding him to stop. Appellant continued to run, and other officers joined the chase. Appellant eventually crawled beneath a vehicle; the officers pulled him out and took him into custody. A .380 caliber semi-automatic firearm was found near the vehicle's right rear axle.

Multiple witnesses identified appellant as Crawford's shooter. Royal Smith, a youth advocate worker, and Christina Ellison, her client, were seated in a vehicle three to five feet away when the shooting occurred. Both identified appellant as the shooter, stating he shot the victim, stood over him after he had fallen, and shot him again. Rahsaan Anderson also identified appellant as the shooter. Angela Sutton testified solely to the shooter's appearance, confirming previous testimony that the shooter was a dark-complected man, standing 5'7"–5'10" tall, and wearing a dark-hooded sweatshirt or dark jacket.

Several police officers testified to appellant's flight and arrest, as well as to finding the gun. Crime Scene Investigator Leo Rahill testified to the ballistic evidence recovered from the scene, including three .380 caliber fired cartridge cases, one fired copper-jacketed projectile bullet, and a sample of Crawford's blood. Ballistics expert John Cannon opined the three cartridges and fired bullet were collected from locations

consistent with someone standing in one spot and firing multiple projectiles, and the semi-automatic weapon found under the vehicle was the same weapon used to fire the projectiles into Crawford's body.

Medical Examiner Dr. Edward Chmara testified Crawford died from multiple gunshot wounds, specifically from blood loss due to a ruptured aorta. The first bullet wound was fatal and entered his upper right back, puncturing his right lung and aorta, and exited under his first rib. The second bullet entered Crawford's right elbow; bullet and jacket fragments remained in his arm's soft tissue and bone. The third and fourth wounds were located in Crawford's lower left back. All bullets recovered from Crawford's body were .380 caliber, consistent with the gun found under the vehicle where appellant hid from police. Appellant did not have a license to carry a firearm.

During the penalty phase, the Commonwealth sought to prove two aggravating factors: during the commission of the offense, appellant knowingly created a grave risk of death to another person in addition to the victim, and appellant was convicted of a prior murder. *See* 42 Pa.C.S. § 9711(d)(7), (d)(11). To meet its burden, the Commonwealth again called ballistics expert John Cannon, who testified a .380 caliber bullet is capable of passing through a human body and harming another person when shot from 80–100 feet. His testimony also established a person need not be in the immediate line of fire to be lethally wounded by such a bullet, as it could ricochet, taking new, unpredictable courses. The Commonwealth also called Assistant District Attorney William Fisher to testify appellant was previously convicted of second degree murder and robbery for his involvement in the killing of a local store manager during a robbery.[3]

Appellant presented mitigating evidence through various family members and friends who testified to appellant's difficult childhood, some admirable qualities, and alleged physical

---

**3.** Appellant was sentenced to life imprisonment for these offenses. The record does not indicate why he was not in jail, but neither party disputes the conviction or the sentence.

and learning disabilities. The testimony alleged appellant struggled with a foot deformity and dyslexia during childhood, his stepfather was an alcoholic, and he had no positive male role model during development. Dr. Allan Tepper, a licensed psychologist, testified appellant was of average intelligence, but had an impaired ability to control his impulses, stunted mental development, and severe personality deficits and defects. Dr. Tepper did, however, find appellant understood rules, was capable of some impulse control, did not suffer from any sort of diminished cognitive ability, was not under the influence of extreme mental or emotional disturbance when he killed Crawford, and presented no indices of an underlying thought disorder.

The jury unanimously found the two aforementioned aggravating circumstances, found no mitigating circumstances, and returned a verdict of death. The trial court sentenced appellant as to all three charges, imposing the death penalty for the first degree murder charge in accordance with the jury's penalty phase findings.

In all cases in which the death penalty is imposed, it is this Court's duty to review the record to ensure the evidence sufficiently supports the first degree murder conviction and the finding of aggravating circumstances, and that the sentence was not the product of passion, prejudice, or other arbitrary factors. 42 Pa.C.S. § 9711(h)(3)(i),(ii); *see also Commonwealth v. Baumhammers*, 599 Pa. 1, 960 A.2d 59, 68 (2008) (citations omitted) ("In all death penalty direct appeals ... this Court reviews the evidence to ensure that it is sufficient to support the conviction or convictions of first-degree murder.").

Beyond the mandatory issues of review, appellant raises six additional claims, which we have paraphrased for ease of discussion:

1. Whether the Commonwealth committed reversible error in questioning a witness so as to infer an identification, violating a pre-trial agreement that the witness would not make an in-court identification.

2. Whether the trial court erred in allowing the admission of hearsay evidence.

3. Whether the trial court erred in allowing the Commonwealth to present an expert witness during the penalty phase to unnecessarily bolster commonly known facts.

4. Whether the prosecutor committed reversible misconduct during the penalty phase by questioning a defense witness about appellant's remorse for a prior conviction.

5. Whether the trial court erred at the penalty phase in allowing a prosecution witness to describe in detail the circumstances of appellant's prior second degree murder conviction.

6. Whether the trial court erred at the penalty phase in instructing the jury on the grave risk of death to others aggravating circumstance.

*Sufficiency Review*

We begin by reviewing the sufficiency of the evidence for first degree murder. In conducting such an analysis, we are obliged to determine whether the evidence presented at trial and all reasonable inferences derived therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, are sufficient to satisfy all elements of the offense beyond a reasonable doubt. *Baumhammers*, at 68; *Commonwealth v. Bridges*, 563 Pa. 1, 757 A.2d 859, 864 (2000).

A person is guilty of first degree murder where the Commonwealth proves: (1) a human being was unlawfully killed; (2) the person accused is responsible for the killing; and (3) the accused acted with specific intent to kill. *See* 18 Pa.C.S. 2502(a); *Baumhammers*, at 68. An intentional killing is a "[k]illing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing." 18 Pa.C.S. 2502(d). "The Commonwealth may prove that a killing was intentional solely through circumstantial evidence. The finder of fact may infer that the defendant had the specific intent to kill the victim based on the defendant's use of a deadly weapon upon a vital part of the victim's body."

*Commonwealth v. Blakeney*, 596 Pa. 510, 946 A.2d 645, 651 (2008) (citations omitted).

Appellant argues the verdict is supported by mere speculation. He cites various testimonial inconsistencies, contending these make the evidence so unreliable and contradictory as to render the verdict pure conjecture, and claiming as much evidence for the shooting lies against Rahsaan Anderson as against himself. Appellant's alleged inconsistencies include: Christina Ellison's initial uncertainties in identifying appellant as the shooter in court,[4] a police officer's redaction of his prior statement that he observed officers tackle appellant before he crawled under the vehicle, and claims police were going to arrest Rahsaan Anderson for the murder but were stopped by the District Attorney. An affidavit of probable cause was prepared for Anderson, but was never approved by the District Attorney; an arrest warrant was never obtained. *See* Appellant's Brief, at 10–11.

The Commonwealth observes multiple people identified appellant as the shooter, and that police officers pursued appellant directly after the crime occurred, eventually detaining him and finding the murder weapon underneath the vehicle where appellant was hiding. The Commonwealth argues the inconsistencies noted by appellant come from an incomplete rendering of witness testimony.

■ We find the Commonwealth established each element necessary to sustain appellants first degree murder conviction. It presented a wealth of evidence pointing to appellant as the person responsible for Crawford's killing. Eyewitnesses, located mere feet away from the shooting, each independently identified appellant as the shooter and gave consistent accounts of his actions. Further establishing appellants identity as Crawford's shooter were the pursuing officers, who stopped

---

4. During her testimony, Christina Ellison initially stated she did not see the shooter in the courtroom. However, she later testified appellant had previously approached her and requested her cell phone number and said the same man who had requested her number was the shooter. When asked why she had not previously identified appellant as the shooter, she stated she could not properly see his face from the witness stand at that time. N.T. Trial, 5/25/05, at 149–50, 174–76, 214–15.

appellant moments after the crime occurred, pursued him upon flight, and recovered the murder weapon from the same location where he hid and was arrested. The Commonwealth also presented medical evidence revealing at least one of the wounds inflicted by appellant was fatal.

Appellant's attempts to characterize the evidence as unreliable and contradictory are belied by the record, which manifestly identifies him as the shooter. *See* N.T. Trial, 5/25/05, at 150, 214–15. More importantly, the "inconsistencies" cited by appellant do not controvert his identity as the shooter or any other element of first degree murder.

Having thoroughly reviewed the record, we find the evidence satisfies each element of first degree murder: (1) Robert Crawford was unlawfully killed; (2) he was killed by appellant; and (3) appellant specifically intended to kill Crawford, as is evidenced by his use of a deadly weapon upon vital parts of Crawford's body. *See Blakeney,* at 651. We therefore find the Commonwealth presented sufficient evidence to convict appellant of first degree murder.

We must now consider the sufficiency of the evidence supporting the aggravating circumstances.

> [T]he verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance … and no mitigating circumstance or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances. The verdict must be a sentence of life imprisonment in all other cases.

42 Pa.C.S. § 9711(c)(1)(iv).

As stated above, the jury found two aggravating circumstances: appellant, in the commission of the offense, knowingly created a grave risk of death to another person in addition to the victim, and appellant had previously been convicted of another murder. *See* 42 Pa.C.S. § 9711(d)(7), (d)(11).

To determine whether the evidence establishes the grave risk of death aggravator, we consider if appellant's behavior brought someone other than the victim into a life-

threatening situation. *Commonwealth v. Boxley*, 596 Pa. 620, 948 A.2d 742, 750 (2008); *see also Commonwealth v. Drumheller*, 570 Pa. 117, 808 A.2d 893, 909 (2002) ("[T]he grave risk of death aggravator 'applies to situations where the [appellant] in the course of killing his particular victim acts in a manner which endangers the lives of others close in proximity to the intended or actual victim.'") (quoting *Commonwealth v. Stokes*, 532 Pa. 242, 615 A.2d 704, 713 (1992)). Sufficient evidence to support the grave risk of death aggravator exists where a nexus connects other persons in close proximity to the intended or actual victim to the zone of danger created by the defendant's actions in killing the victim. *Commonwealth v. Paolello*, 542 Pa. 47, 665 A.2d 439, 457 (1995). We have previously held the grave risk of death aggravator applies where there is potential for an errant, ricochet, or pass-through bullet; the endangered bystander need not be in the direct line of fire to be in grave risk of death. *Commonwealth v. Wright*, 599 Pa. 270, 961 A.2d 119, 146 (2008).

The Commonwealth presented ballistics expert testimony indicating a .380 caliber bullet is capable of passing through a human body and harming another person when shot from 80–100 feet, even if that person is not in the immediate line of fire. Testimony revealed appellant fired upon Crawford within three to five feet of at least two people. Others were inevitably placed at risk, as appellant shot Crawford in an area rife with students and subway patrons, as well as restaurant and gas station clientele. This evidence proves other persons were within the zone of danger created by appellant's violent actions, supporting a finding of the grave risk of death aggravator. The prior murder aggravator was satisfied, as neither party disputes appellant was previously convicted of second degree murder.

Though appellant contends the failure of any juror to find even one mitigating circumstance in light of the amount of testimony presented suggests the verdict is a result of arbitrariness, we find the jury's conclusion is supported by the record. The jury heard from appellant's brother, who grew

up in similar circumstances and had not acted out in violence. Additionally, expert testimony revealed appellant understands rules, is capable of some impulse control, does not suffer from any sort of diminished cognitive ability, was not under the influence of extreme mental or emotional disturbance when he killed Crawford, and exhibits no indices of an underlying thought disorder. Indeed, this testimony and the accompanying case facts remove appellant from the majority of the mitigating circumstances recognized by law.[5] That the jury found insubstantial the evidence offered as mitigation, especially when compared to the aggravating circumstances, does not render the death verdict arbitrary.

### Guilt Phase Claims

Appellant contends the trial court erred in denying him a mistrial, alleging the prosecutor committed reversible misconduct by eliciting testimony which was the functional equivalent of an identification—knowingly violating a pre-trial agreement that Angela Sutton would not be asked to provide an identification. In response, the Commonwealth claims it honored the pre-trial agreement, and Ms. Sutton only testified to what she observed at the crime scene.

5. Our law recognizes the following mitigating circumstances:

(1) The defendant has no significant history of prior criminal convictions.

(2) The defendant was under the influence of extreme mental or emotional disturbance.

(3) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

(4) The age of the defendant at the time of the crime.

(5) The defendant acted under extreme duress, although not such duress as to constitute a defense to prosecution under 18 Pa.C.S. § 309 (relating to duress), or acted under the substantial domination of another person.

(6) The victim was a participant in the defendant's homicidal conduct or consented to the homicidal acts.

(7) The defendant's participation in the homicidal act was relatively minor.

(8) Any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense.

42 Pa.C.S. 9711(e)(1)-(8).

Prior to Ms. Sutton's testimony, the following conversation took place at sidebar:

[Prosecution]: I'm willing to concede that [Sutton] will ... testify as to what [she] saw and heard and describe what [she] saw and heard but will not be asked to identify and would be so informed by me before [she takes] the stand.

[Defense]: That's fine with me, Judge. That's exactly what my position was.

N.T. Trial, 5/25/05, at 5.

The testimony to which appellant objects is as follows:

Q: When the person—when a person was brought back in handcuffs, did you see them placed in a police car?

A: Yes.

Q: Did you get a chance to look into that police car?

A: Um, yes.

Q: From what angle did you look into that police car?

A: I was in the back of the car, um, looking in the back window. Um, I seen, um, the guy they had in custody with his head down (indicating).

Q: Okay. Did you notice—so you—is it fair to say you could only see whatever was above the rear seat, the top of the rear seat?

A: Yeah. Yeah.

Q: What did you notice atop the rear seat, if anything?

A: Um, the only thing I noticed, that he didn't have on what he had on when he shot the victim.

Q: What did you see?

A: I seen a gray hood (indicating).

N.T. Trial, 5/27/05, at 31–32.

As the trial court aptly noted, an in-court identification is essentially witness testimony which points a condemning finger at the accused during trial. Trial Court Opinion, 4/4/08, at 12 (quoting *Commonwealth v. Fowler*, 466 Pa. 198, 352 A.2d 17, 20 (1976)). During her testimony, Angela Sutton described the shooter's physical attributes and actions; she also

stated she saw the man the police had in custody and noticed he was not wearing the same thing he had on when he shot the victim.

Appellant's argument is that Ms. Sutton's descriptions constitute an identification because the jury had to be aware she was describing appellant. Indeed, the agreement specifically permitted descriptive testimony and prohibited identification testimony—that these two terms were distinguished in the agreement itself belies appellant's argument that Sutton's description constituted a *de facto* identification. Appellant cannot first agree to allow descriptive testimony and then object to unfavorable descriptions.

A true identification would have violated a pre-trial agreement that she would not be asked to identify him. However, Ms. Sutton did not identify the accused, but only described the scene as she observed it—which is precisely what was agreed to by both parties on the record. Ms. Sutton explicitly told the jury she did not see the shooter's face long enough to make an actual identification and was only describing her observations of the man in the back of the police car. N.T. Trial, 5/27/05, at 49–50. That the jury had previously heard what appellant was wearing when he was arrested is irrelevant; Ms. Sutton did not implicate appellant in the crime, and never once stated someone in the courtroom resembled the shooter. Rather, by relaying her observations, she simply confirmed what had previously been stated. Her testimony contained only such information as agreed to by both parties and therefore does not constitute an impermissible identification.

 Even if such testimony had amounted to an impermissible identification, to obtain relief for alleged prosecutorial misconduct, (which is the framework in which this issue is cast), appellant must establish the prosecutor's conduct "had the unavoidable effect of prejudicing the jury ... as to render it incapable of fairly weighing the evidence and arriving at a just verdict." *Commonwealth v. Carson,* 590 Pa. 501, 913 A.2d 220, 236 (2006) (citations omitted). In this case, Ms.

Sutton's confirmation of previous testimony was at most cumulative, as previous witnesses had described appellant's actions and appearance. The testimony was certainly not so prejudicial as to render the jury incapable of achieving a fair and just verdict. We therefore affirm the trial court's denial of appellant's request for a mistrial based upon alleged prosecutorial misconduct.

Appellant next argues the trial court erred by denying him a mistrial following the Commonwealth's cross-examination of Detective Rodden. The defense called Detective Rodden regarding witnesses who contributed to the affidavit of probable cause for Rahsaan Anderson, and made the affidavit a defense exhibit. Appellant argues the cross-examination of Detective Rodden informed the jury there were other witnesses beyond those which testified, and implied those witnesses incriminated him in their statements to the detective; appellant contends he had no opportunity to cross-examine the witnesses who incriminated him but did not testify in court. *See Crawford v. Washington,* 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) (Confrontation Clause bars testimonial out-of-court statements unless witnesses unavailable and defendants had prior opportunity to cross-examine witnesses, regardless of whether such statements are deemed reliable by court). Appellant also contends Detective Rodden's references to statements from the affidavit of probable cause amounted to hearsay, which should have resulted in a mistrial.

In response, the Commonwealth argues the prosecutor simply asked Detective Rodden whether he had reviewed all the information contained in the affidavit—which included statements of witnesses who were not called to testify at trial. The Commonwealth contends no hearsay occurred because the prosecutor never explored the substance of the witness statements.

"Questions regarding the admissibility of evidence rest within the trial judge's discretion, and an appellate court will reverse the judge's decision only for an abuse of discre-

tion." *Commonwealth v. Vandivner*, 599 Pa. 617, 962 A.2d 1170, 1179 (2009) (citations omitted). Notably, it was the defense who introduced the affidavit of probable cause into evidence. Clearly, if the defense admitted an exhibit, the prosecution must be permitted to question that exhibit on cross-examination. The prosecutor questioned Detective Rodden as to his investigation methods, particularly in regard to the exhibit's general content and to the witnesses interviewed. At no time was the affidavit's language read aloud to the jury, nor were any witness statements discussed, other than to say the document contained specific witness statements. As no statements, incriminating or otherwise, were actually provided to the jury, neither the Confrontation Clause nor the hearsay rule was violated. The questions were not improper, and any inferences derived therefrom were a matter for the jury going to the weight of the evidence. Accordingly, we reject appellant's *Crawford* and hearsay arguments.

### Penalty Phase Claims

Appellant next argues the trial court erred at the penalty phase by denying a defense motion to preclude Officer John Cannon's expert ballistics testimony. Appellant argues there were no facts which required expert testimony and the admission of such testimony was more prejudicial than probative, because the jury would be easily swayed by the highly accredited expert's opinion.

Officer Cannon's testimony was used to prove the grave risk of death aggravating factor. *See* 42 Pa.C.S. § 9711(d)(7). The Commonwealth argues the ballistics expert was called to explain general details regarding the speed and power with which the rounds from appellant's firearm travelled, and also to explain ricochet or pass-through bullets can be lethal from certain distances.

Again, the admission and exclusion of evidence is a matter within the discretion of the trial judge and shall only be overturned upon a finding of abuse of discretion. *Vandivner*, at 1179. The Pennsylvania Rules of Evidence provide:

> If scientific, technical or other specialized knowledge beyond that possessed by a layperson will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise.

Pa.R.E. 702. "Although relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Id.*, 403. " 'Unfair prejudice' means a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially." *Id.* (Cmt).

As has previously been discussed, there is sufficient evidence to support the grave risk of death aggravator when a nexus connects other persons in close proximity to the intended or actual victim to the zone of danger created by the defendant's murderous actions. *Paolello*, at 457. The aggravating circumstance applies where potential exists for an errant, ricochet, or pass-through bullet. *Wright*, at 146.

Appellant contends Officer Cannon's expert testimony at the penalty phase did nothing other than state the obvious fact that bullets travel fast and can ricochet. However, Officer Cannon did more than reaffirm the obvious. Instead, he provided the jury with specific information relating to the speed of a .380 caliber bullet (the specific weapon used to kill Crawford) upon ejection from the firearm, the distances that bullet is able to travel, and the bullet's ability to ricochet or pass through another body and lethally harm a bystander, even if the bystander was not in the immediate line of fire. The Commonwealth carried the burden of proving appellant's actions endangered the lives of others in close proximity to the victim; the information provided by Officer Cannon was material for the jury in this case to fully understand the zone of danger and the actual potential for errant, ricochet, or pass-through bullets.

In weighing the relevance and probative value of the evidence against its possible prejudicial effects, we find the force and speed of the projectile, as well as its ability to harm others outside of the line of fire, are material factors in this case to the determination of whether the grave risk aggravator applies, and thereby outweigh the potential prejudicial impact the expert testimony may have had upon the jury. Therefore, we find the trial court's permissive allowance of this expert testimony at the penalty phase did not constitute an abuse of discretion.

Appellant next contends the trial court erred at the penalty phase by allowing detailed testimony of appellant's prior murder offense. Appellant argues the testimony was inflammatory and more prejudicial than probative.

We disagree. In *Commonwealth v. Rios*, 591 Pa. 583, 920 A.2d 790 (2007), we rejected a similar argument. The appellant in *Rios* contended the Commonwealth need only show he had the relevant prior convictions and it was improper to introduce details of the prior convictions, as they were unnecessary and would only serve to prejudice the jury. *Id.*, at 814. We found the argument to be contrary to our law, stating:

[A] capital sentencing hearing is not a sanitized proceeding limited only to evidence of aggravating circumstances. *Rather, it must, by necessity, inform the jury of the history and natural development of the events and offenses with which the appellant is charged, as well as those which he has been convicted,* so that the jury may truly understand the nature of the offenses and Appellant's character. *The jury simply cannot perform its function in ignorance of the facts of the crime for which Appellant is being sentenced, or the crimes for which he has previously been convicted, to the extent that those crimes may properly support the existence of aggravating circumstances provided in Section 9711(d).*

*Id.*, at 814–15 (emphasis in original) (quoting *Commonwealth v. Marshall*, 537 Pa. 336, 643 A.2d 1070, 1074 (1994)).

As the Commonwealth acted in accordance with our precedent allowing for the introduction of testimony pertaining to the facts and circumstances of appellant's prior convictions for purposes of proving the application of aggravating circumstances, we reject appellant's argument and affirm the trial court's admission of testimony pertaining to appellant's prior murder conviction.

Appellant next claims the prosecutor committed reversible misconduct during the penalty phase by asking appellant's grandfather whether appellant ever expressed remorse for his prior murder. Appellant contends the prosecutor's question created bias, prejudice, and hostility.

The trial court instructed the jury during preliminary instructions that questions posed by the attorneys were not evidence and should not be considered as such. N.T. Trial, 5/25/05, at 18. "A pillar upon which our system of trial by jury is based is that juries are presumed to follow the instructions of the court." *Commonwealth v. Means,* 565 Pa. 309, 773 A.2d 143, 157 (2001) (citations omitted). Defense counsel objected to the question, the trial court sustained the objection, and no answer was provided. As the jury knew the question was not to be considered as evidence, and as no answer was provided, appellant's argument is without merit.

Finally, appellant contends the trial court erred in giving jury instructions on the meaning of the grave risk of death to others aggravating circumstance. Appellant argues the instruction essentially mandated the jury to find the aggravating circumstance applied by conflating the concept of endangerment with death, and by suggesting the grave risk of death need not apply to real people, but only to potential people. Appellant references *Paolello* and *Commonwealth v. Bolden,* 562 Pa. 94, 753 A.2d 793 (2000), for the proposition a grave risk is found only where others are actually in close proximity to the victim at the time of the murder and thereby are in jeopardy of suffering significant harm.

In reviewing a penalty phase jury instruction, we must consider the entire charge and not merely discrete

portions thereof. *Commonwealth v. Eichinger,* 591 Pa. 1, 915 A.2d 1122, 1138 (2007) (citations omitted). Moreover, "[t]he trial court is free to use its own expressions as long as the concepts at issue are clearly and accurately presented to the jury." *Id.* Only when the court commits an abuse of discretion or provides the jury with an inaccurate statement of law is there reversible error. *Commonwealth v. Hall,* 549 Pa. 269, 701 A.2d 190, 207 (1997).

The language to which appellant objects is as follows:

[O]nly the following ... can be found to be the aggravating circumstances: ... in the commission of the offense, the defendant knowingly created a grave risk of death to another person in addition to the victim of the offense. ... And in that regard I will tell you that a jury can infer that an individual is knowingly endangering a person when that individual uses a gun in any area where he knows that others could be.

N.T. Trial, 6/2/05, at 108.

Having considered the entirety of the instruction, we find both of appellant's arguments fail. The instruction states "a jury can infer that an individual is *knowingly* endangering a person when that individual uses a gun in any area where he knows that others could be." *Id.* (emphasis added). The instruction, contrary to appellant's assertions, does not imply the aggravating factor is fully satisfied by the mere act of shooting a gun where others may be. Rather, the instruction states the knowledge element of the aggravating circumstance is satisfied when a defendant chooses to fire a gun into an area where he knows people could be.

This conclusion is supported by the fact that the jury instruction utilized this Court's language. In *Commonwealth v. Watson,* 523 Pa. 51, 565 A.2d 132 (1989), we employed this precise language to explain that the knowledge element of the aggravating circumstance was satisfied in such a case. We held:

In a day and age where accidental victims of shootings are prosaic, a jury can infer that an individual is *"knowingly"*

> *endangering a person when that individual uses a gun in any area where he knows that the others could be.* This interpretation of (d)(7) is supported by legislative enactment and the prior decisions of this Court.

*Id.,* at 140 (emphasis added). *Watson* remains good law, and our capital jurisprudence since that time does not suggest the language to be flawed. *See, e.g., Commonwealth v. DeJesus,* 584 Pa. 29, 880 A.2d 608, 619 (2005) (grave risk of death found where appellant opened fire with assault rifle on car passing through residential area); *Commonwealth v. Jones,* 542 Pa. 464, 668 A.2d 491, 519–20 (1995) (evidence bullets intended for victim at grocery store could have struck other store patrons sufficient to support grave risk aggravator). We therefore conclude the jury instruction, when viewed as a whole, was proper and in accordance with our jurisprudence.

In conclusion, our review of the record establishes sufficient evidence supports appellant's first degree murder conviction. We additionally find the Commonwealth presented evidence that established two aggravating circumstances beyond a reasonable doubt. Furthermore, we find the sentence imposed was not the product of passion, prejudice, or any other arbitrary factor, but was supported by the evidence submitted at trial. 42 Pa.C.S. § 9711(h)(3)(i),(ii). We therefore affirm the jury's verdict and the sentence of death imposed by the trial court.

The Prothonotary of the Supreme Court of Pennsylvania is directed to transmit the complete record of this case to the Governor of Pennsylvania. *Id.,* § 9711(i).

Judgment of sentence affirmed.

Jurisdiction relinquished.

Chief Justice CASTILLE, Justices BAER, TODD, McCAFFERY and GREENSPAN join the opinion.

Justice SAYLOR files a concurring opinion.

Justice SAYLOR, concurring.

I join the majority opinion, except for its treatment of Appellant's claim that the prosecutor violated a pre-trial agreement to the effect that one of its witnesses, Angela Sutton, would not be asked to make an identification of Appellant as the shooter.

The majority reasons that Ms. Sutton's testimony did not implicate Appellant, despite evidencing that Appellant, in the words of the district attorney, had "the same complexion as the shooter [and] the same build as the shooter," N.T., May 31, 2005, at 153. *See* Majority Opinion, op. at 118, 987 A.2d at 709.[1] The majority position, however, is contrary to that of the prosecutor at trial, who argued to the jury that "Angela Sutton, without pointing to a person in the courtroom, *identifies him (indicating) as the killer.*" N.T., May 31, 2005, at 154 (emphasis added).[2] There may be some semantic reason why connecting a criminal defendant's characteristics with those of a perpetrator does not rise to a full scale "identification," but the record shows the prosecutor knew well that he was using Ms. Sutton's testimony to advance the Commonwealth's identification case.

Some difficulty in evaluating this claim stems from the Commonwealth's present representation, in its brief, that the prosecutor's only agreement was to refrain from presenting an "in-court" identification. *See* Brief for Appellee at 14. In his rejoinders to the defense objection at trial, however, the district attorney took the position that he was not presenting

1. Ms. Sutton's testimony specifically concerned a comparison of the characteristics of the shooter and a man in police custody; however, there was never any dispute that Appellant was the referenced man in custody. *See, e.g.,* N.T., May 25, 2005, at 186–87 (reflecting trial counsel's comment to the trial court, "My client—how can I deny that my client was brought back in handcuffs? I mean, he was.").

2. With regard to the inconsistency concerning Appellant's jacket, the prosecutor explained that, "[t]he police have opened up his black jacket by now to search him, remember, when they caught him. When she said 'black jacket,' she's talking about him. When she says 'gray hoodie,' she's talking about him." N.T., May 31, 2005, at 154.

*any* form of identification. The following passage from the trial transcript is illustrative:

[Defense Counsel]: ... [If Ms. Sutton is] asked and says that she can identify that the person who was brought back was the same person who did the shooting, that's an identification.

[District Attorney]: She is not. She says he has the same complexion and build with what seems like a different coat.

N.T., May 27, 2005, at 29.

Since the prosecutor overcame the defense objection upon the representation that Ms. Sutton was not offering "an identification," it was obviously inappropriate for him to later relate to the jurors that Ms. Sutton "identifies [Appellant] as the killer." N.T., May 31, 2005, at 154.[3]

I support the result attained by the majority, based on an application of the review standards governing consideration of a claim of prosecutorial misconduct (since Appellant's claim is styled as such). Under prevailing law, such a claim requires the proponent to demonstrate that the district attorney's actions "had the unavoidable effect of undermining the neutrality of the jury so as to preclude the rendering of a true verdict." *Commonwealth v. Kennedy*, 598 Pa. 621, 634, 959 A.2d 916, 923–24 (2008).

As the Commonwealth argues at length, three other witnesses provided eyewitness testimony directly implicating Appellant, and police immediately pursued Appellant from the scene and recovered the weapon used to kill the victim from the location at which Appellant was seized. In such circumstances, it appears to me unlikely that Ms. Sutton's testimony, albeit clearly bolstering the already strong identification of

---

**3.** Even the trial court's questions of the witness conveyed that Ms. Sutton's testimony represented, at a minimum, a *de facto* identification. Specifically, Ms. Sutton testified that the shooter wore a white cap, and the trial court initiated the following interchange concerning the cap:

The Court: And did *he still* have the white skully when you saw *him* in the car?

[Ms. Sutton]: No.

N.T., May 27, 2005, at 59 (emphasis added).

Appellant as the shooter, was of determinative effect in the finding of his guilt.