J-A08040-17

2017 PA Super 138

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                                       :           PENNSYLVANIA
                                         :
             v.                        :
                                         :
ROBERT SHABAZZ-DAVIS       :
                                       :
          Appellant           :    No. 2525 EDA 2015

Appeal from the Judgment of Sentence March 13, 2015
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0007330-2013

BEFORE: PANELLA, LAZARUS, JJ., and STEVENS, P.J.E.[*]

OPINION BY STEVENS, P.J.E.:                    **FILED MAY 08, 2017**

Appellant Robert Shabazz-Davis appeals the judgment of sentence entered in the Court of Common Pleas of Philadelphia County on March 13, 2015, at which time he was sentenced to life imprisonment without the possibility of parole along with a consecutive term of three and one half (3½) years to seven years in prison following his convictions of first-degree murder and firearms not to be carried without a license.[1] Appellant was a juvenile at the time of the murder, bringing his case within the purview of **Miller v. Alabama**, 567 U.S. 460, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012), and **Commonwealth v. Batts**, 620 Pa. 115, 66 A.3d 286 (2013)("**Batts II**") (invalidating mandatory sentences of life without the possibility of

_____

[*] Former Justice specially assigned to the Superior Court.
[1] 18 Pa.C.S.A. §§ 2502(a), 6106(a)(1), respectively.

parole for juvenile offenders and indicating that appellate remedy for the unconstitutional imposition of a mandatory life-without-parole sentence upon a juvenile is a remand for resentencing at which the trial court must consider the sentencing factors set forth in **Miller**).[2]  Following a careful review, we affirm.

The trial court aptly set forth the facts herein as follows:

On May 28, 2012, at approximately 2:13 p.m., police officers from the 22nd District responded to a radio call of a shooting at 1732 Ridge Avenue. (N.T. 10/24/14 p. 89).  Upon arrival officers found decedent Antwan Pack lying in a pool of blood on the floor inside the Sunshine Laundromat. (N.T., 10/24/14 pp. 89-90).  Police Officer Joseph Kocher observed that decedent was in critical condition with multiple gunshot wounds to the back. (N.T., 10/24/14 p. 90).  Eyewitness Jeffrey Noble helped police officers place Mr. Pack into a police wagon. (N.T., 10/24/14 p. 61).  Mr. Noble and Officer Kocher rode in the back of the wagon with decedent as he was transported to Hahnemann Hospital. (N.T., 10/24/14 p. 91).  Mr. Noble testified that en route to the hospital, Mr. Pack stated someone named "'Rob' from Highland" had shot him. (N.T., 10/24/14 pp. 68-69.  Officer Kocher also testified that on the way to the hospital, Mr. Pack identified the male that shot him as "Rob." (N.T., 10/24/14 p. 92).  Mr. Pack was admitted to Hahnemann Hospital and was taken to surgery, at around 3:00 p.m., in an attempt to save his life, but he was pronounced dead at 7:39 p.m. (N.T., 10/27/14 p. 100).  The autopsy report showed decedent had been shot twice in the back and suffered devastating injuries including fractures to his vertebrae, which rendered him paralyzed, and lacerations of his liver, left lung, and right lung, which prevented him from breathing and ultimately caused his death. (N.T., 10/27/14 pp. 99-107).  Six

_____

[2] At the time of the murder, Appellant was sixteen years old and turned seventeen twenty-three (23) days later.

fired cartridge casings and one projectile were recovered from the scene of the crime. (N.T., 10/24/14 p. 53).

Eyewitnesses Antwyne Askew and Marcus Pough testified at trial about the events that took place the day decedent was shot and killed. On June 16, 2012, Mr. Askew gave an interview to homicide detectives wherein he stated that while standing on the corner of Vineyard Street and Ridge Avenue, on May 28, 2012, he observed a male on a bicycle brandish a weapon. (N.Y., 10/27/14 pp. 36-38). Seconds later, he heard gunshots. (N.T., 10/27/14 pp. 36-37). Looking in the direction of the gunshots he observed the male on the bicycle known to him as "Rob" shooting at decedent. (N.T., 10/27/14 pp. 37-40). Mr. Askew identified "Rob" as [Appellant] Robert Shabazz-Davis from a photographic array. (N.T., 10/27/14 p. 43). Further, in his interview, Mr. Askew stated that [Appellant] and decedent had previously argued with each other. (N.T., 10/27/14 pp. 44-45).[1] Mr. Pough was interviewed on June 27, 2012, and he stated that on the day of the shooting, he was walking down Ridge Avenue towards the laundromat with his niece when he observed a male firing a gun into the laundromat. (N.T., 10/24/14 p. 129). Mr. Pough stated further that he saw the male place the gun in his waistband and ride off on a bicycle towards him. (*Id*.) Mr. Pough walked past the laundromat and observed decedent on the floor inside the laundromat suffering from gunshot wounds and screaming for help. (*Id.*) Later, Mr. Pough was shown a photographic array and identified [Appellant] as the male he saw firing a gun into the laundromat. (N.T., 10/24/14 pp. 139-140).[2]

By June 30, 2012 a number of unsuccessful attempts had been made to locate [Appellant] on an arrest warrant charging him with the murder of decedent and various weapons offenses. (N.T., 10/27/14 p. 116). Extensive efforts to apprehend [Appellant] continued without immediate success. (N.T., 10/27/14 pp. 117-124). On January 28, 2013, [Appellant's] attorney notified authorities that [Appellant] wanted to surrender. (N.T., 10/27/14 p. 124). On that same day, [Appellant] was finally arrested. (*Id.*)

On July 13, 2012, Daquan Johnson was arrested after fleeing police. (N.T., 10/27/14 pp. 86-91). He was found to be in possession of the firearm used to kill Antwan Pack. *Id*. Officer Michael Livewell testified that, according to social media websites, Mr. Johnson identified himself as a member of Highland and was one of [Appellant's] associates. (N.T., 10/27/14 pp. 13-15).

----

[1] At trial, Mr. Askew denied that he in fact made such statements and identified the shooter. (N.T., 10/27/14 p. 37-43). However, Detective Jacobs, who took Mr. Askew's statement, testified to his statements and identification. (N.T., 10/27/14 p. 70-76). The jury was given the opportunity to view the signatures above and below the photographs on the array and determine Mr. Askew's credibility regarding his denial.

[2] Mr. Pough denied making those statements and identifying the shooter from the photo array at trial. (N.T., 10/24/14 pp. 141-142). However, Detective Schmidt, who took Mr. Askew's statement, testified to his statements and identification. (N.T., 10/24/14 p. 170-183).

Trial Court Opinion, filed 6/28/16, at 1-3.

On March 22, 2015, Appellant filed his "Motion for Post Sentence Relief And/Or Modification or Reconsideration of Sentence," and the same was denied by operation of law pursuant to Pa.R.CrimP. 720(B)(3) on August 6, 2015. Appellant filed a notice of appeal *pro se* on August 18, 2015, and upon consideration of defense counsel's motion to withdraw and a hearing, the trial court entered an Order on October 2, 2015, granting counsel's motion to withdraw. Thereafter, on November 6, 2015, counsel was reappointed to represent Appellant on direct appeal. On June 12, 2016, Appellant filed his Statement of Matters Complained of on Appeal pursuant to Pa.R.A.P. 1925(b) wherein he raised ten (10) issues. The trial court filed its Rule 1925(a) Opinion on June 28, 2016.

In his brief. Appellant presents the following Statement of the Questions Involved:

1.     In *Miller v. Alabama*, the U.S. Supreme Court outlawed mandatory life without parole for juveniles ("LWOP"), and instructed that the discretionary imposition of this sentence should be "uncommon" and reserved for the "rare juvenile offender whose crime reflects irreparable corruption."

A.     Did the Trial Court err when it imposed the sentence of life without the possibility of parole on Appellant despite the safeguards set forth by our Supreme Court in *Miller v. Alabama* and in contradiction of the safeguards provided by the United States Constitution and the Pennsylvania Constitution?

B.     There is currently no procedural mechanism to ensure that juvenile LWOP will be "uncommon" in Pennsylvania.  Should this Court exercise its authority under the Pennsylvania Constitution to promulgate procedural safeguards including (a) a presumption against juvenile LWOP, (b) a requirement for competent expert testimony, and (c) a "beyond a reasonable doubt" standard of proof?

C.     In *Miller*, the U.S. Supreme Court stated that the basis for its individualized sentencing requirement was *Graham's* comparison of juvenile LWOP to the death penalty.  [ ] Appellant received objectively less procedural due process than an adult facing capital punishment. Should the Court address the constitutionality of [ ] Appellant's sentencing proceeding?

D.     Did the trial court err in not dismissing the case against Appellant due to the Commonwealth's blatant violations under *Brady v. Maryland*?

2. Did the Trial Court err in not dismissing the case against Appellant due to the Commonwealth's blatant violations under *Brady v. Maryland*?[3]

---

[3] ***See Brady v. Maryland****,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (holding suppression by prosecution of evidence favorable to accused upon request violates due process where evidence is material either to guilt or punishment, regardless of good or bad faith by prosecution).

Brief of Appellant at 4.

At the outset, we observe that Appellant's introductory comment and issues B and C are, verbatim, the same questions which our Pennsylvania Supreme Court agreed to consider in granting partial allowance of appeal in **Commonwealth v. Batts** ("**Batts III**"), 125 A.3d 33 (Pa.Super. 2015), *appeal granted in part*, 135 A.3d 176 (Pa. 2016).  In addition, Appellant's issue A herein is reflected in the issues the Supreme Court will consider in **Batts III**.[4]  Notwithstanding, we decline to postpone a decision in this case

_____

[4] Our Supreme Court's *Per Curiam* Order entered on April 19, 2016, reads as follows:

> **AND NOW,** this 19th day of April, 2016, the Petition for Allowance of Appeal is **GRANTED, LIMITED TO** the following issues raised by Petitioner:
> 1. In *Miller v. Alabama,* the U.S. Supreme Court outlawed mandatory life without parole for juveniles (LWOP), and instructed that the discretionary imposition of this sentence should be "uncommon" and reserved for the "rare juvenile offender whose crime reflects irreparable corruption."
>> i. There is currently no procedural mechanism to ensure that juvenile LWOP will be "uncommon" in Pennsylvania. Should this Court exercise its authority under the Pennsylvania Constitution to promulgate procedural safeguards including (a) a presumption against juvenile LWOP; (b) a requirement for competent expert testimony; and (c) a "beyond a reasonable doubt" standard of proof?
>> ii. The lower court reviewed the Petitioner's sentence under the customary abuse of discretion standard. Should the Court reverse the lower court's application of this highly deferential standard in light of *Miller?*
> 2. In *Miller,* the U.S. Supreme Court stated that the basis for its individualized sentencing requirement was Graham's

*(Footnote Continued Next Page)*

pending the Supreme Court's resolution of the appeal in **Batts**, **III**.   Until

our Supreme Court holds otherwise, we will employ the applicable legal

principles extant currently, and in doing so first find Appellant has waived his

second and third issues for his failure to raise them before the trial court and

preserve them in his Pa.R.A.P. 1925(b) statement.

> "Issues not raised in the lower court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a). This requirement bars an appellant from raising "a new and different theory of relief" for the first time on appeal. **Commonwealth v. York**, 319 Pa.Super. 13, 465 A.2d 1028, 1032 (1983).
> In addition, our Supreme Court has made it clear that "[a]ny issues not raised in a [Rule] 1925(b) [S]tatement will be deemed waived." **Commonwealth v. Castillo**, 585 Pa. 395, 888 A.2d 775, 780 (2005) (citation and quotation omitted). **See also** Pa.R.A.P. 1925(b)(4)(ii) ("The [1925(b) ] Statement shall concisely identify each ruling or error that the appellant intends to challenge with sufficient detail to identify all pertinent issues for the judge").

---
*(Footnote Continued)* ─────────────────

comparison of juvenile LWOP to the death penalty. The Petitioner received objectively less procedural due process than an adult facing capital punishment. Should the Court address the constitutionality of the Petitioner's resentencing proceeding?

The Petition for Allowance of Appeal is **DENIED** with respect to Petitioner's third stated issue.

**Commonwealth v. Batts**, 135 A.3d 176 (Pa. 2016).

*Commonwealth v. Wanner*, 2017 WL 1152609, at * 2 (Pa.Super. filed Mar. 28, 2017).

Appellant's issues B and C raised in his appellate brief request this court to engage in a broad constitutional analysis and develop procedural safeguards for determining "uncommonality," while the issues he raised in his Rule 1925(b) Statement essentially pertained to the legality of his sentence in light of *Miller v. Alabama, supra*. Therefore, Appellant has waived these claims.[5]

As appellant's issue A is evident from his statement of matters complained of on appeal, we will consider the merits of the same. Therein Appellant challenges the legality of his sentence of life imprisonment without the possibility of parole in light of the federal and state constitutions and the United States Supreme Court's decision in *Miller, supra*.

_____

[5] We note Appellant's brief is in violation of Pa.R.A.P. 2119(a), which provides that "[t]he argument shall be divided into as many parts as there are questions to be argued," in that it is not divided into sections that correspond to the questions presented. While the Statement of the Questions Presented consists of two issues, the first of which contains three subparts, the Argument portion of the brief begins with Section A entitled "*Miller* and *Montgomery* Establish A Presumption Against Imposing Life Without Parole Sentences On Juveniles," under which are subsections numbered 1 through 8. Issue B pertaining to Appellant's *Brady* claim follows.

A challenge to the legality of a sentence ... may be entertained as long as the reviewing court has jurisdiction." ***Commonwealth v. Wolfe***, 106 A.3d 800, 802 (Pa.Super. 2014), *affirmed*, 140 A.3d 651 (Pa. 2016) (citation omitted). "If no statutory authorization exists for a particular sentence, that sentence is illegal and subject to correction." ***Commonwealth v. Rivera***, 95 A.3d 913, 915 (Pa.Super. 2014) (citation omitted). "An illegal sentence must be vacated." ***Id.*** "The determination as to whether the trial court imposed an illegal sentence is a question of law; our standard of review in cases dealing with questions of law is plenary." ***Commonwealth v. Stradley***, 50 A.3d 769, 772 (Pa.Super. 2012) (citation omitted).

In ***Miller***, the United States Supreme Court held "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.'" ***Miller***, 567 U.S. at _____, 132 S.Ct. at 2460. Although the Court made clear that it was not foreclosing a trial court's ability to impose a life sentence upon a juvenile convicted of murder, it required the trial court to first "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." ***Id.*** at _____, 132 S.Ct. at 2469. The Supreme Court recognized that a sentencing court might encounter the rare juvenile offender who exhibits such irretrievable depravity that rehabilitation is impossible and life without parole is justified. But in light of what it described as "children's diminished

- 9 -

culpability and heightened capacity for change," ***Miller*** made clear that "appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon." ***Id.*** Therefore, it was the mandatory sentencing scheme that the Supreme Court deemed unconstitutional when applied to juveniles, holding that "a judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles." ***Id.*** at \_\_\_\_, 132 S.Ct. at 2475.

In ***Batts II***, ***supra***, our Supreme Court remanded to the trial court with instructions to consider the following age-related factors in resentencing the appellant:

> [A]t a minimum [the trial court] should consider a juvenile's age at the time of the offense, his diminished culpability and capacity for change, the circumstances of the crime, the extent of his participation in the crime, his family, home and neighborhood environment, his emotional maturity and development, the extent that familial and/or peer pressure may have affected him, his past exposure to violence, his drug and alcohol history, his ability to deal with the police, his capacity to assist his attorney, his mental health history, and his potential for rehabilitation. [***Commonwealth v.***] ***Knox***, 50 A.3d [732,] 745 [ (Pa.Super. 2012) ] (citing ***Miller***, 132 S.Ct. at 2455) [(remanding for resentencing a juvenile who had previously received a mandatory life without parole sentence in violation of ***Miller***, and instructing trial court to resentence juvenile to either life with parole or life without parole), ***appeal denied***, 620 Pa. 721, 69 A.3d 601 (2013)]. We agree with the Commonwealth that the imposition of a minimum sentence taking such factors into account is the most appropriate remedy for the federal constitutional violation that occurred when a life-without-parole sentence was mandatorily applied to Appellant. ***Batts II***, ***supra*** at 297 (first brackets in original).

***Batts III***, ***supra***, 125 A.3d at 38-39.

Our review of the transcript of the sentencing hearing belies Appellant's contention that the sentencing court "made no finding that Appellant was irreparably corrupt, permanently incorrigible, or irretrievably depraved, as **Miller** and **Montgomery** require." Brief for Appellant at 15. To the contrary, the sentencing court indicated its awareness that because Appellant had been sixteen years of age at the time of the homicide, "he was entitled to the relief provided to defendants so situated by our United States Supreme Court as articulated in Miller versus Alabama and subsequently adopted by the Pennsylvania Supreme Court with those safeguards contained in Commonwealth versus Batts." N.T. Sentencing, 3/13/15, at 4.

The sentencing court further explained to Appellant why it had ordered presentence and mental health evaluations to prepare for sentencing as follows:

> [O]ver the time that you were awaiting trial, you heard from one or more attorneys that our Supreme Court decided in Batts that, in essence, children are different from adults for purposes of sentence and it requires the Court to conduct what's commonly referred to as individualized consideration of mitigating circumstances, particularly the defendant's youth, before a sentence of life in prison without the possibility of parole can be imposed. That is because children lack those qualities that inure to an adult and it is their underdeveloped sense of responsibility that makes them susceptible to influences and they generally have a less fixed character than adults.
>     So for that reason, I ordered the various reports and set the matter down for sentencing today.

*Id*. at 7-8.

Prior to rendering its sentence, the sentencing court heard from the victim's grandmother, aunt, and mother, respectively. *Id*. at 17-24. The sentencing court also was introduced to various friends and family members of Appellant all of whom it noted obviously "have great love for him." *Id*. at 40. The court indicated that it had reviewed the presentence investigation report and taken into consideration all the required factors including Appellant's need for rehabilitation and society's need for protection and further stated the following:

> I've taken into consideration all the factors I'm required to, including [Appellant's] need for rehabilitation and society's need for protection. I've reviewed the presentence investigation, I've reviewed the mental health examination, and I have gone over the memorandum prepared by the Assistant District Attorney.
>
> With respect to [Appellant's] chronological age, we have referred to him as being sixteen, but he was more a seventeen year old than a sixteen year old, obviously still a year and a month short of reaching his majority. But that is to be considered.
>
> Regarding his level of maturity, he's now fathered two children. His home environment was not the best but certainly not the worst. He was co-parented at least until his father died by both his mother and his father.
>
> I'll say this with some trepidation. I hope it doesn't come back to haunt me. But clearly, men who look like me are not in their children's lives to the degree that they should be and that causes problems, in my humble opinion.
>
> There was nothing in the record that suggested that [Appellant] was subject to domestic violence, physical violence or sexual violence. He was the architect of this crime. He bears total responsibility for this crime. It was a vicious killing in the light of day, without any concern for the fact that somebody might see me and tell the authorities who did this.

Unlike the previous case I referenced, [6] it wasn't one on one, two men face to face. The victim was shot in the back for the sin of living in the wrong neighborhood by a young man with no underlying mental health problems, who has a history of violence and demonstrating he was not amenable to rehabilitation. [7]

I have heard from the family of the deceased. I've seen members of [Appellant's] family array themselves here and stand up, and it's obvious they have great love for him.

Our Supreme Court has said that life in prison for a crime committed by a juvenile should be rare. It is most unfortunate that this is one of those rare cases.

*Id*. at, 3/13/15, at 38-41.

In light of the foregoing, we find the trial court applied the appropriate review prior to rendering its sentence and did not abuse its discretion in considering the relevant sentencing factors set forth in *Batts*, *II*. "Absent a specific directive from our Supreme Court or the General Assembly to do so, we decline to expand the narrow holding in *Miller*." *Batts III*, *supra*, 125 A.3d at 43.

Lastly, Appellant asserts the trial court erred in denying his motion to dismiss based upon the Commonwealth's violation of *Brady v. Maryland*, **supra**, and consequently, requests this Court to dismiss all charges. "To

---

[6] The trial court earlier referenced a case wherein a young man had fired six shots at another in a residential community believing he had been cut off. The other individual fired back, although no one was killed. N.T. Sentencing, 3/13/15, at 38.

[7] Appellant had an extensive history with the juvenile justice system which commenced in June of 2010 when he had been adjudicated delinquent of felony robbery. Two months after he was discharged from juvenile supervision on March 22, 2012, Appellant committed the instant murder.

- 13 -

succeed on a ***Brady*** challenge, the defendant must show: (1) the Commonwealth suppressed the evidence; (2) the evidence was favorable to the accused, either because it was exculpatory or impeaching; and (3) the defendant suffered prejudice. ***Commonwealth v. Daniels***, 628 Pa. 193, 223, 104 A.3d 267, 284 (2014).

Herein Appellant maintains the Commonwealth failed for more than two years to provide him with a statement of Marcus Pough wherein Mr. Pough implicated himself in a separate homicide as well as all evidence relating to the arrest of Daquan Johnson on July 3, 2012, who possessed the murder weapon used to kill the victim in his waistband. Brief for Appellant at 29-30.

In his Motion to Dismiss filed on June 26, 2014, Appellant averred that Mr. Johnson was arrested on July 13, 2012, after fleeing police at which time the firearm used in the instant homicide was recovered from his person, although this information was not disclosed to the defense until June 11, 2014. ***See*** Motion to Dismiss at ¶ 4. In addition, Appellant indicated that on June 27, 2012, Mr. Pough provided police with a statement wherein he implicated himself in a separate homicide and that this statement preceded Mr. Pough's statement that he had seen Appellant kill Mr. Pack. ***Id***. at 11. This information, too, was not provided to the defense until June 11, 2014. ***Id***. at 12. Appellant reasoned that as the Commonwealth withheld evidence that was clearly favorable to the defense for nearly two years, he

had been prejudiced and, therefore, "[n]o other remedy short of dismissal [would] protect [his] right to due process and a fair trial nor serve the goals of justice." *Id*. at ¶ 14-17.

Prior to his filing of his Motion to Dismiss, Appellant's motion for a continuance of trial had been granted on June 23, 2017. The Commonwealth detailed in its Response thereto, that before Appellant's preliminary hearing held on June 5, 2013, the Commonwealth disclosed to the defense that Mr. Pough had been charged as an accomplice in an unrelated homicide, and during the hearing defense counsel questioned him regarding those open charges as well as the statement he provided to homicide detectives in the instant homicide. **See** Commonwealth Response to Defense Motion to Dismiss at ¶ 3. Hearings on Mr. Pough's own murder case were open to the public and transcripts thereof were prepared; notwithstanding, "in an effort to ensure that counsel was adequately prepared for trial, [the ADA] provided a copy of Mr. Pough's statement in his own homicide case." *Id*.

In addition, on July 3, 2013, the Commonwealth made available to Appellant a discovery letter wherein "Ballistics Report" was listed. That entry referenced a six-page report from ballistics in the Philadelphia Police Department's Firearm Identification Unit, at the end of which it was indicated all shots fired at the scene of Mr. Pack's murder were from the same firearm. A "Cross Check Request" also was indicated. *Id*. at ¶ 4. The Commonwealth went on to reason as follows:

5.   Page six of six of the Ballistics Report which was prepared in September 2012, describes in detail the results of the cross check.  To a reasonable degree of scientific certainty, all of the evidence from the homicide scene was fired in "PISTOL P1 of FIU #123778-DC#1209-028326."   Armed with the district control number, defense was able to access the public portal of the First Judicial District Website and find the following information: defendant's name, defendant's attorney, arrest date, arresting officer, court dates and charges.   With reasonable diligence, defense counsel was able to subpoena the arresting officer, request discovery, order notes of testimony, interview the defendant, attend the court dates, and contact counsel for the defendant.  Commonwealth v. Morris, 822 A.2d 684 (Pa. 2003).  All of this information was accessible to the defense.  On June 11, 2014, ADA O'Malley, in an effort to ensure that counsel was adequately prepared for trial, provided a copy of the arrest paperwork that was provided on June 11, 2014 to the Commonwealth by the assigned detective regarding P-1.

*Id*. at ¶ 5.

Upon our review of the certified record, we find the trial court did not err in failing to afford relief on Appellant's *Brady* claim upon finding the evidence was immaterial to Appellant's guilt or innocence and that Appellant had failed to establish the Commonwealth's conduct unavoidably prejudiced the jury as to render it incapable of weighing the evidence fairly and arriving at a just verdict. Trial Court Opinion, filed 6/28/16, at 13 quoting ***Commonwealth v. Brown***, 605 Pa. 103, 119, 987 A.2d 699, 709 (2009). Thus, Appellant cannot demonstrate a *Brady* violation. ***See Feese***, supra.[8]

_____

[8] Moreover, as the trial court points out, even had the evidence been provided to Appellant at an earlier date, it would not have altered the overwhelming evidence of his guilt, which included two eyewitness

*(Footnote Continued Next Page)*

- 16 -

Judgment of Sentence Affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>5/8/2017</u>

---

*(Footnote Continued)* ─────────────

identifications; therefore he could not have established prejudice. Trial Court Opinion, filed 6/28/16, at 13.