**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KEITH EPPS | : | |
| | : | |
| Appellant | : | No. 1526 EDA 2019 |

Appeal from the PCRA Order Entered April 16, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0012195-2009

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KEITH EPPS | : | |
| | : | |
| Appellant | : | No. 1527 EDA 2019 |

Appeal from the PCRA Order Entered April 16, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0012200-2009

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KEITH EPPS | : | |
| | : | |
| Appellant | : | No. 1529 EDA 2019 |

Appeal from the PCRA Order Entered April 16, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0012204-2009

BEFORE: PANELLA, P.J., NICHOLS, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:                    Filed: August 13, 2020

Keith Epps (Epps) appeals from the order entered in the Court of Common Pleas of Philadelphia County (PCRA court) dismissing his timely petition filed pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541-9546. We affirm.

**I.**

This case arises from Epps' jury conviction at the above-listed docket numbers of two counts each of second-degree murder and robbery, one count of burglary and three counts criminal conspiracy[1] for the June 27, 2009 shooting deaths of Rian Thal (Thal) and Timothy Gilmore (Gilmore). The shootings occurred during a botched robbery inside of an apartment complex located in the Northern Liberties section of Philadelphia where Thal resided. Thal was a party promoter and was involved in a cocaine shipment that was transported by Gilmore and Edward Emerson by tractor-trailer from Texas to Philadelphia. Thal's business partner, Leon Woodard (Woodard), arranged the drug deal and moved the cocaine into Thal's apartment, accompanied by Vernon Williams (Williams). Unbeknownst to Thal or Woodard, Williams[2] told

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 2502(b), 3701, 3502 and 903.

[2] Williams died in a car accident one month after the shootings.

Epps about the cocaine and the money tied to it and they hatched a plan to steal it.

Epps contacted a friend who lived in Thal's building, Katoya Jones (Jones) and she agreed to provide access to the building in exchange for a cut of the drug proceeds.[3] Epps coordinated with Donnell Murchison (Murchison), Langdon Scott (Scott) and Edward Daniels (Daniels) to carry out his plan. Scott initially participated under the impression that he was purchasing drugs only. He refused to be a part of the plan once he learned of the robbery. Antonio Wright (Wright) became involved instead.

Wright, Murchison and Daniels entered the apartment building at about 5:00 p.m. to wait for Thal and Gilmore. Epps waited in a van and called Murchison as the two victims entered the building. When Thal and Gilmore exited the elevator, Wright and his co-defendants announced the robberies. Wright shot Gilmore when he resisted. Murchison shot Thal in the head, killing her instantly. Murchison then shot Gilmore twice in the head after he noticed that Gilmore was still alive.[4] The men fled the building and entered Epps' van

---

[3] Jones entered a guilty plea to two counts of third degree murder and robbery and one count of conspiracy and burglary in exchange for her cooperation in this case.

[4] Murchison provided a statement to police and pled guilty to first-degree murder in connection with this case. Because of concerns for his safety and that of his family, he was housed in federal prison instead of in Philadelphia. He was uncooperative at trial and refused to answer questions because of threats against his family.

without the money or cocaine. Police recovered four kilos of cocaine and over $100,000.00 from Thal's apartment. They arrested Epps and his co-conspirators after examining surveillance video footage, cell phone records and ballistics tests.[5]

On December 1, 2011, a jury convicted Epps, along with Wright and Daniels, of the above-mentioned charges. The trial court sentenced Epps to consecutive life terms for second-degree murder, with concurrent sentences on the remaining charges. On direct appeal, this Court vacated two of the three conspiracy convictions but affirmed the judgment of sentence in all other respects. (*See Commonwealth v. Epps*, 2015 WL 7571700, Pa. Super. filed Nov. 24, 2015) (unpublished memorandum). Our Supreme Court denied Epps' petition for allowance of appeal on May 24, 2016.

On February 1, 2017, Epps filed this counseled PCRA petition followed by several court-permitted supplements raising multiple claims of ineffective assistance of counsel as well as an after-discovered evidence claim relating to *Brady v. Maryland*, 373 U.S. 83 (1963).[6] On April 16, 2019, the PCRA court

---

[5] Scott identified Murchison and Daniels as the men on surveillance video. He was stabbed 11 times in prison after the preliminary hearing. Scott entered an open guilty plea to charges of robbery, conspiracy and burglary in exchange for his testimony in this case.

[6] In *Brady*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87.

entered its order dismissing the petition without a hearing after it issued a Rule 907 notice. *See* Pa.R.Crim.P. 907(1). Epps timely appealed and he and the PCRA court complied with Rule 1925. *See* Pa.R.A.P. 1925(a)-(b).

## II.

Epps' contends, for many reasons, that his trial counsel was ineffective. *See* 42 Pa.C.S. § 9543(a)(2)(ii) (listing ineffective assistance of counsel as basis for PCRA relief).[7] "To be entitled to relief on an ineffectiveness claim, a PCRA petitioner must establish that: (1) the underlying claim has arguable merit; (2) no reasonable basis existed for counsel's action or failure to act; and (3) he suffered prejudice as a result of counsel's error, with prejudice measured by whether there is a reasonable probability the result of the proceeding would have been different." *Commonwealth v. Treiber*, 121 A.3d 435, 445 (Pa. 2015) (citation omitted). We presume that counsel has rendered effective assistance. *See id.* Counsel cannot be found ineffective for failing to raise a baseless or meritless claim. *See id.*

Additionally, "[a] petitioner is not entitled to a PCRA hearing as a matter of right; the PCRA court can decline to hold a hearing if there is no genuine

---

[7] "We review an order dismissing a petition under the PCRA in the light most favorable to the prevailing party at the PCRA level." *Commonwealth v. Ford*, 44 A.3d 1190, 1194 (Pa. Super. 2012) (citation omitted). "This review is limited to the findings of the PCRA court and the evidence of record." *Id.* (citation omitted). "We will not disturb a PCRA court's ruling if it is supported by evidence of record and is free of legal error." *Id.* (citation omitted).

issue concerning any material fact, the petitioner is not entitled to PCRA relief, and no purpose would be served by any further proceedings." ***Commonwealth v. Adams-Smith***, 209 A.3d 1011, 1019 (Pa. Super. 2019) (citation omitted). A PCRA court's decision to deny a request for an evidentiary hearing will not be overturned absent an abuse of discretion. ***See Commonwealth v. Mason***, 130 A.3d 601, 617 (Pa. 2015).

**A.**

Epps raises myriad claims contending that trial counsel was ineffective for failing to object to certain comments made by the prosecutor during his jury trial. He argues that counsel should have objected when the prosecution: improperly vouched for the credibility of Commonwealth witnesses by arguing that they were telling the truth; argued and elicited testimony that its witnesses feared for their safety, even though the threats of harm could not be connected to Epps; emphasized in his opening statement that some co-defendants had already entered a guilty plea; expressed his personal disagreement with defense counsel by stating "There are a lot of things I disagree with him [defense counsel]"; compared Epps' rights at trial with those of the victims and their families; and commented on the defendants' collective decision not to testify at trial. We will address these arguments which, when reduced to their core center on allegations of prosecutorial misconduct, together for ease of disposition.

Generally, a prosecutor's arguments to the jury do not constitute reversible error unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds a fixed bias and hostility towards the defendant which would prevent them from properly weighing the evidence and rendering a true verdict. *See Commonwealth v. Poplawski*, 852 A.2d 323, 327 (Pa. Super. 2004). "A prosecutor must have reasonable latitude in fairly presenting a case to the jury and must be free to present his or her arguments with logical force and vigor." *Id.* (citation omitted).

"Our review of prosecutorial remarks and an allegation of prosecutorial misconduct requires us to evaluate whether a defendant received a fair trial, not a perfect trial." *Commonwealth v. Judy*, 978 A.2d 1015, 1019 (Pa. Super. 2009) (citation omitted). We must keep in mind that comments made by a prosecutor must be examined within the context of defense counsel's conduct, and that the prosecutor may fairly respond to points made by the defense. *See id.* Moreover, prosecutorial misconduct will not be found where statements were based on the evidence or proper inferences therefrom or were only oratorical flair. *See id.*

In this case, the PCRA court rejected Epps' claims of ineffectiveness for counsel's failure to object to the prosecutor's instances of alleged misconduct, explaining:

> There is no indication in the parts of the record to which [Epps] refers that the prosecutor sought to convince the jury that its witnesses were more believable than any other witnesses based on information known only to the Commonwealth. [Epps']

- 7 -

argument assumed that the prosecutor improperly vouched for his witnesses in this case, without any consideration of the context of those comments or the fact that the goal of defense counsel in this matter was to convince the jury that the cooperators were not telling the truth. At no time did the prosecutor provide assurances of the credibility of its witnesses based on either the prosecutor's personal knowledge or other information not contained in the record. Clearly then, [the prosecutor's statements] did not amount to vouching. ***See Commonwealth v. Fisher***, 813 A.2d 761, 768 (Pa. 2002) (finding no merit in claim challenging that prosecutor improperly vouched for credibility of prosecution witness, because when read in context it was clear prosecutor was only attempting to counter defense counsel's attack on their testimony.) Counsel, thus had no basis for objecting to the cited testimony.

To the extent that [Epps] argues that counsel should have objected because the jury could have inferred from testimony given by Jones, Scott and Murchison that they had been threatened that they were telling the truth, the record does not support his claim. With regard to Jones, she testified that she was afraid because, "I don't know what the outcome [of the trial] is going to be" and that she was, therefore, worried about her safety and that of her ex-fiancé and family. (N.T. Trial, 11/15/11, at 192-93). Concerning Scott, he testified that [Daniels] stabbed him and in no way implied that [Epps] played any role in the assault. (***See*** N.T. Trial, 11/16/11, at 88-92). Regarding Murchison, this Court instructed the jury to strike Murchison's testimony *in toto*. (***See*** N.T. Trial, 11/21/11, 20-26). ***See Commonwealth v. Brown***, 987 A.2d 699, 712 (Pa. 2009) (A pillar upon which our system of trial by jury is based is that juries are presumed to follow the instructions of the court.") (citation omitted). There is nothing in the record showing that the jury failed to follow this court's instruction.

It is further noted that with regard to Murchison, the record shows that a [Darryl] Shuler threatened him, not [Epps]. (***See*** N.T. Trial, 11/18/11, 29, 51, 57-58).[8] Finally, this court cured any harm the testimony may have endangered by instructing the jury that [Epps] had no involvement in the stabbing. Given the

---

[8] Shuler was close to Thal and was involved in the robbery. (***See id.*** at 58).

foregoing, it is clear that no prejudice inured to [Epps] due to counsel's alleged inaction.

In addition, this court rejected [Epps's] subclaims because [he] failed to provide any meaningful discussion regarding the prejudice prong of the ineffectiveness test. . . . He failed to explain why the verdict would have been different or that prior counsel's ineffectiveness overrode the reams of evidence Commonwealth presented establishing [Epps's] guilt. It included evidence that both directly and circumstantially established beyond a reasonable doubt and [Epps] was part of the scheme to rob Thal including the testimony of cooperating witnesses and phone records that tied [Epps] to both the general area where the crime occurred and to his co-actors.

\*　　\*　　\*

This Court's review of the record indicates that the prosecutor did not cross the line applicable to a prosecutor's closing argument. The record shows that in addition to saying that two people were dead and there were two families grieving, the prosecutor also stated that the defendants had the right to exercise their rights to a trial thereby curing the harm, if any[.] . . . In addition . . . the jury already knew that two persons were dead and that two families were grieving. The remarks complained of in no way sought to engender sympathy for the victims and merely reiterated a well-known fact.

(PCRA Court Opinion, 8/26/19, at 10-12, 23; some citations omitted; citation formatting provided).

After review of the record, we agree with the PCRA court's assessment. Epps fails to explain how the effect of the prosecutor's challenged comments was to prejudice the jury so as to form in their minds a fixed bias and hostility towards him, thereby preventing them from objectively weighing the evidence and rendering a true verdict. *See Poplawski, supra* at 327. The trial court made clear to the jury that it was the Commonwealth's burden to establish

guilt beyond a reasonable doubt and that they were the sole judges of the facts of this case. The court also instructed that Epps had the constitutional right to remain silent and the jury could not draw any adverse inferences from the fact that none of the defendants testified. (*See* N.T. Trial, 11/30/11, at 25-30). As the PCRA court noted, the jury is presumed to have followed the court's instructions. Additionally, the prosecutor expressly told the jury during closing argument: "If I say anything about the law that differs from the Judge, you forget about me because he is the master of the law. If I say anything about the facts that differs from your recollection, you forget about me[.]" (N.T. Trial, 11/29/11, at 118). Because Epps has failed to show that the prosecutor's conduct affected the fairness of his trial, the PCRA court properly denied him relief on this issue.

## B.

Epps also challenges trial counsel's failure to object to the trial court's limitation on the scope of cross-examination of Scott regarding the details of his plea agreement. According to Epps, this limitation violated his Sixth Amendment right to confront the witnesses against him.

> As this Court has explained, the Sixth Amendment of the United States Constitution provides that, [i]n all criminal prosecutions, the accused shall enjoy the right to be confronted with the witnesses against him. This protection has been incorporated into the Fourteenth Amendment and thus is applicable in state court prosecutions.
>
> In the context of cross-examining a testifying witness, this Court has explained that a defendant's right to confrontation means more than being allowed to confront the witness physically.

Indeed, the main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination. Of particular relevance here, the Supreme Court of the United States has recognized that the exposure of a witness'[s] motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination. It does not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. On the contrary, trial judges retain **wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination** based on concerns about, among other things, harassment, and prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant. . . . [T]he Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.

*Commonwealth v. Akrie*, 159 A.3d 982, 988 (Pa. Super. 2017) (emphasis added).

Instantly, Scott testified as follows on cross-examination regarding the implications of his plea agreement when reviewing its terms with counsel:

Q: The Defendant [Scott] understands that he can and will be prosecuted for perjury if he makes any false statements under oath; right?

A: Yes.

Q. So they can still prosecute you for perjury, right?

A. Yes.

Q. You agree that completeness of the Defendant's cooperation in these matters as it relates to the terms and conditions of this agreement is solely within the discretion of the Commonwealth. Did I read that right?

A. Yes.

*    *    *

Q. The only thing the Judge gets to decide is what sentence to impose; right?

A. Yes.

Q. Truthfulness, completeness, whether or not what you said on the stand is consistent, that's for them to decide; right?

A. Yes.

Q. Now, what happens if they decide that you haven't been truthful?

[The Commonwealth]: Objection, hypothetical.

The Court: Well. I think it is beyond the scope. I think once they decide exactly what they would do, he wouldn't know. Obviously they would bring it to the attention of the Court but go ahead.

(N.T. Trial, 11/16/11 Vol. II, at 19-21). Scott then testified he understood that he could not withdraw his guilty plea and that the Commonwealth had agreed not to bring any additional charges against him stemming from the shootings. (*See id.* at 22-23).

As can be seen, defense counsel cross-examined Scott extensively regarding the terms of his plea agreement with the Commonwealth and exposed his potential bias. Furthermore, with regard to counsel's specific inquiry as to what would happen if the Commonwealth determined Scott's testimony was untruthful, it is plain from Scott's earlier testimony that the consequence could be a perjury charge. The trial court exercised its wide latitude by placing a reasonable restriction on the scope of cross-examination and counsel was not ineffective for failing to raise a meritless objection

- 12 -

thereto. *See Commonwealth v. Staton*, 120 A.3d 277, 293 (Pa. 2015) (stating counsel cannot be deemed ineffective for failing to lodge a meritless objection).[9]

## C.

Epps next maintains that defense counsel was ineffective for failing to object to the trial court's restriction precluding him from mentioning during closing argument that some of the witnesses had avoided a possible life sentence by cooperating with the Commonwealth.

First, we find Epps waived this single-paragraph argument for his failure to properly develop it with citation to any pertinent legal authority. *See* Pa.R.A.P. 2119; 2101. In any event, it lacks merit.

It is well-settled that jurors should not be instructed by the court or advised by counsel during closing argument of the defendant's potential sentence if the jury finds him guilty. *See Commonwealth v. White*, 531 A.2d 806, 808 (Pa. Super. 1987). Because any reference to the witnesses

---

[9] Epps' reliance on *Commonwealth v. Murphy*, 591 A.2d 278, 280 (Pa. 1991), is unpersuasive where the circumstances of that case are readily distinguishable. In *Murphy*, counsel failed to cross-examine a key witness on the basis of her then-existing juvenile probation to show her possible bias. The Court found that "It was incumbent upon defense counsel to bring to the jury's attention the possibility that [the witness] had a motive for testifying against the defendant, whether based upon a formal agreement with the prosecution or a subjective belief that she would receive favorable treatment with regard to her juvenile probation." The facts of *Murphy* are inapposite to the instant case where defense counsel vigorously questioned Scott at length regarding the terms of his plea agreement with the Commonwealth to show his possible motive for testifying against Epps.

facing a life sentence would have made obvious to the jury the penalty Epps faced, the court imposed this reasonable restriction to prevent the jury from learning this information. Defense counsel was not ineffective for declining to raise a meritless objection to this limitation.

**D.**

Epps also contends that counsel was ineffective for failing to object to Philadelphia Police Detective Ohmar Jenkins' reading of the statement of co-defendant Wright during direct examination by the Commonwealth. In the statement, Wright details his own role in the robbery. Relying on ***Bruton v. United States***, 391 U.S. 123 (1968), Epps claims that reading the statement violated his Sixth Amendment right to confrontation. Epps argues that, although Wright's statement did not expressly mention him by name, the Commonwealth connected the statement to him through its questioning of Detective Jenkins and its guilt by association approach. Epps further maintains that the trial court's instruction regarding Write's statement was unclear and left the jurors in a position to use the statement against him.

In ***Bruton***, in a joint trial, a postal inspector testified that the co-defendant orally confessed to him that he **and the petitioner** committed an armed robbery. The trial court instructed the jury that the co-defendant's confession inculpating the defendant had to be disregarded in determining his guilt or innocence. The United States Supreme Court held that because of the substantial risk that the jury, despite the instruction, looked to the

extrajudicial statements in determining the petitioner's guilt, admission of the co-defendant's confession in this joint trial violated the petitioner's right of cross-examination under the Confrontation Clause.

This holding is very narrow, however, and does not apply when a co-defendant's confession is redacted to omit any specific reference to the defendant and can be linked to the defendant only by inferential incrimination. *See Commonwealth v. James*, 66 A.3d 771, 777 (Pa. Super. 2013) (concluding that appellant's rights under the Confrontation Clause were not violated by admission of his co-defendant's statement at their joint trial where all references to appellant were replaced with the neutral phrase "the other guy" and the court issued appropriate cautionary instruction).

Instantly, Detective Jenkins testified with regard to Wright's statement:

Q: Detective Jenkins, did Mr. Wright say anything about how he was willing to give this statement?

A. Yes. After viewing the [surveillance] video [with a handgun in his hand] he indicated that, again, he would make a statement, but only to his involvement only.

Q. Meaning what?

A. He just wanted to say what he did, not say what anyone else did.

Q. Did you and Detective Glenn attempt to convince him to talk about his codefendants?

A. Yes, we did. As you can see, to no avail. He was adamant talking about what he did, not about what anyone else did.

Q. So you agreed to take the statement the way he wanted?

A. Correct.

* * *

Q. Going to page 2 [of Wright's statement], can you tell us why you were at 1050 Handcock Street? Answer, I was called down there by someone to do a robbery. Question, Antonio, do you know how much or what you were going to get from this robbery? Answer, I was told there was a lot of money and work inside the apartment. Question, Antonio, what do you mean by work? Answer, drugs. It was cocaine.

* * *

Question, Antonio, how many people were involved in this robbery? Answer, the video shows you everything, me and everyone else. . . . Question, Antonio, is it true that you want only to admit your involvement in the incident and not implicate anyone else? Answer, yes.

(N.T. Trial, 11/16/11, at 287, 289-91).

The trial court issued the following instruction to the jury at the close of trial:

> You have heard evidence in this case that several of the witnesses made statements earlier or testified earlier at a preliminary hearing and their testimony was inconsistent in certain aspects with the testimony they gave here at trial before you.
>
> That is for you to determine with each witness whether they are inconsistent, to looks at those inconsistencies. You may, if you choose, regard the prior statements or the prior testimony as proof of the truth of anything that the witness said in an earlier statement. You may also consider this evidence to help you judge the credibility and weight of the testimony given by the witnesses at this trial.
>
> The Commonwealth has introduced evidence of a statement given by the defendant, Antonio Wright, that it claims was made by that Defendant. You may consider the statement as evidence against **this Defendant** but before you do so, you must find that,

- 16 -

in fact, a crime was committed; otherwise, you must disregard the statement.

\* \* \*

. . . [I]f you find that the Defendant made the statement voluntarily, **then you may consider the statement as evidence against the Defendant**, **and this only applies to the Defendant, Wright**. You should consider the facts and circumstances surrounding the making of the statement along with all other evidence in the case in judging its truthfulness in deciding how much weight, if any, the statement deserves on the question of whether the Defendant has been proven guilty.

(N.T. Trial, at 31-32, 40) (emphases added).

It is clear that Wright's statement described only his own actions and he repeatedly refused to identify the other co-conspirators or even reveal how many there were. Because Wright's statement did not directly reference Epps and the court issued an appropriate cautionary instruction, there was no confrontation violation. Contrary to Epps' assertion, the trial court's instruction expressly directed that Wright's statement could be considered as to Wright's guilt only. In light of these circumstances, we conclude counsel was not ineffective for failing to raise objections relating to Wright's statement.

**E.**

Epps next argues that trial counsel was ineffective for failing to object to the testimony of Philadelphia Police Detective Ron Dove, who analyzed the phone records of the co-conspirators and matched them with available video surveillance footage. Specifically, Epps claims that counsel should have

objected to Detective Dove's opinion identifying him as the "one central figure" in the crime. (N.T. Trial, 11/21/11, at 200). Epps asserts that this statement functioned as an expert opinion on his guilt and relieved the jury of its obligation to fact-find and assess credibility.

The PCRA court found this claim lacked merit because defense counsel **did object** to this line of questioning. Our review of the record confirms the same. On direct examination by the Commonwealth, Dove testified:

> Q. Now, from analysis point of view, what were you looking to do, what were you looking for when you looked through Mr. Epps' phone records?
>
> A. Based on Katoya [Jones'] interview, she makes it clear that [Epps] was the mastermind or organizer of this burglary—
>
> [Defense counsel]: **Objection**.
>
> A. —this robbery.
>
> The Court: What is the objection?
>
> [Defense counsel]: To the **characterization, mastermind**.
>
> [The Commonwealth]: He is explaining what he was looking for in the records, he did that based on, it is not for the truth. It is for why he did what he did.
>
> [The Court]: Overruled.

(***Id.*** at 28-29) (emphasis added).

After Detective Dove painstakingly reviewed the tremendous amount of phone activity between Epps and the other actors, the Commonwealth elicited the following testimony:

Q: In terms of the people that you identified as being involved in the burglary and a robbery, murder, did people speak to each other?

A: No.  As you can see—

[Defense Counsel]:  Your Honor, objection.  How could he possibly tell?  The phones had contact.

[The Commonwealth]:  I will rephrase.

The Court:  Rephrase the question.  Objection sustained.

Q: The phones you linked to each of these people, were these phones talking with each other or were they all connecting back to one or two central figures?

A: There is clearly one central figure in all of this, every single person on there.  One thing in common that they all do, they all contact or he contacts them, Keith Epps.

(*Id.* at 200).  The detective then detailed the contacts each co-conspirator had with Epps, including that Jones had contact only with Epps and no other actor; and Murchison had contact only with Epps and Scott.  (*See id.* at 201).

Thus, the record reflects that defense counsel did object to the detective's characterization of Epps as the mastermind behind the robbery. The record further bears out that Detective Dove did not render an expert opinion regarding Epps' guilt and instead identified him as the common denominator between all participants in the robbery after his exhaustive review of voluminous phone records.  Epps' claim merits no relief.[10]

_____

[10] Epps relies on **Commonwealth v. McClure**, 144 A.3d 970, 977 (Pa. Super. 2016), in which this Court found the trial court erred in allowing a police

**F.**

Epps also maintains that trial counsel was ineffective for failing to consult or hire a cell phone expert to support the defense theory of the case that he was at a strip club called Delilah's Den at the time of the shooting and was not outside of Thal's apartment building as the Commonwealth alleged. At trial, the Commonwealth's cell phone expert, William Shute, testified that it was not possible that Epps made the relevant phone calls from Delilah's, reasoning that the many walls and lack of windows at the club would have caused refraction, which was inconsistent with the evidence showing Epps made the calls from an area with a clear signal. Epps identifies an expert who he asserts would have effectively challenged this conclusion regarding his location.

"Where a claim is made of counsel's ineffectiveness for failing to call witnesses, it is the appellant's burden to show that the witness existed and was available; counsel was aware of, or had a duty to know of the witness; the witness was willing and able to appear; and the proposed testimony was necessary in order to avoid prejudice to the appellant." *Commonwealth v. Chmiel*, 30 A.3d 1111, 1143 (Pa. 2011) (citation omitted).

---

detective to express opinions that neither he nor a CYS employee believed the defendant. However, as discussed, Detective Dove in no way testified to the same effect.

- 20 -

The PCRA court denied relief on this claim, finding that testimony from Epps' cell phone expert that he disagreed with the Commonwealth's expert testimony at trial that Epps could not have been at Delilah's Den because of "refraction" because it would not have altered the outcome of this case. We agree that even if Epps had presented evidence challenging Shute's conclusion, there is no reasonable probability that the outcome of his trial would have been different.

Specifically, the Commonwealth presented the testimony of Jones and Scott, both of whom identified Epps as the formulator of the plan. The Commonwealth also established that Epps had numerous phone contacts with his cohorts leading up to and on the day of the robbery, further inculpating him as the central figure in the crime. (*See* N.T. Trial, 11/21/11, at 32-70). For example, the records indicated that Epps spoke with Jones 29 times on the day of the murders; with Scott, 11 times; and with Murchison, 30 times that day. (*See id.* at 38-39, 41). The records also shows that Epps made a phone call to Murchison at 5:14 p.m. just before video surveillance footage shows Thal and Gilmore enter the apartment building at 5:15 p.m. (*See id.* at 52-53).

In light of the evidence against him, Epps failed to show a reasonable probability that the result of the proceeding would have differed had such testimony been presented. Because he has not established prejudice, his claim does not merit relief.

**III.**

Epps next challenges the PCRA court's decision to not hold a hearing on his after-discovered evidence claim asserting a ***Brady*** violation. ***See*** 42 Pa.C.S. § 9543(a)(2)(vi) (listing after-discovered exculpatory evidence as basis for PCRA relief). Specifically, Epps claims that the Commonwealth withheld exculpatory evidence in the form of an internal affairs investigation Philadelphia Police Detective William Pitts for misconduct. Although Detective Pitts did not testify at Epps' trial, he did interview Commonwealth witnesses Jones and Scott. Because the internal investigation showed that Detective Pitts used force, threats of force and other forms of misconduct to coerce inculpatory statements from witnesses in **other** cases, Epps argues that a hearing was necessary to explore whether Detective Pitts used these tactics in this case. Epps maintains that he would offer this type of evidence to show that the accusations Jones and Scott made against him were unreliable.

To be entitled to relief based on a claim of after-discovered evidence under the PCRA, a petitioner must plead and prove that his conviction or sentence resulted from "[t]he unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced." 42 Pa.C.S. § 9543(a)(2)(vi). A petitioner must establish that the evidence: "(1) could not have been obtained prior to the conclusion of the trial by the exercise of reasonable diligence; (2) is not merely corroborative or cumulative; (3) **will**

**not be used solely to impeach the credibility of a witness**; and (4) would likely result in a different verdict if a new trial were granted." **Commonwealth v. Tedford**, 2020 WL 1932768, at *15 (Pa. filed Apr. 22, 2020) (emphasis added; citation omitted). We are also mindful that "a **Brady** violation consists of three elements: (1) suppression by the prosecution (2) of evidence, whether exculpatory or impeaching, favorable to the defendant, (3) to the prejudice of the defendant." **Id.** at *12 n.11 (citation omitted).

To support his claim of police coercion, Epps points to Jones' trial testimony that her initial statement to police did not mention him at all. Jones named Epps only after the detectives "badger[ed her] with questions" and showed her a picture of Thal. (N.T. Trial, 11/15/11, at 68).

A review of Jones' testimony in full context, however, does not implicate any police misconduct. Instead, Jones testified that while she initially did not implicate Epps in the incident, she then wanted to tell the truth and cooperate with police after they obtained her cell phone records showing her communication with Epps. Police also showed Jones a picture of Thal to humanize the victim. At that point, Jones "broke" and told the truth. (**See id.** at 65-73).

Regarding Scott, Epps points to nothing in Scott's testimony or anything in the record to support his claim of possible police coercion affecting Scott's testimony. Rather, the record reflects that Scott entered an open guilty plea to several charges for his role in this case and that, as part of his plea

agreement, testified in court as a Commonwealth witness. (**See** N.T. Trial, 11/15/11, at 4-5).

The PCRA court rejected Epps' after-discovered evidence claim, finding that he presented no evidence indicating that Detective Pitts engaged in any misconduct in **this** case. (PCRA Ct. Op., at 28). Instead, Jones and Scott willingly cooperated with the Commonwealth by providing statements and testifying as its witnesses at trial. Thus, Epps' claims lack record support.

Further, as the PCRA court notes, in **Commonwealth v. Brown**, 134 A.3d 1097 (Pa. Super. 2016), this Court examined in a case on direct appeal whether evidence that a police detective used aggressive and violent tactics to pressure witnesses into making false statements could constitute after-discovered evidence. The **Brown** Court found that even assuming the evidence was admissible, it could be used only to impeach the detective's credibility. Because the proposed witnesses would allege that the detective committed misconduct in **other** murder cases, "none of the witnesses can provide any new evidence concerning his conduct **in this case**." **Id.** at 1109 (emphasis added).

Similarly, in this case, even assuming testimony regarding Detective Pitt's misconduct was admissible, it could only be used to impeach the credibility of Jones and Scott. Therefore, the testimony cannot form the basis for an after-discovered evidence claim in this case.

In sum, after review of the record, we conclude that the PCRA court properly denied Epps' PCRA petition without a hearing.

Order affirmed.

President Judge Panella joins the memorandum.

Judge Nichols did not participate in the consideration or decision of this case.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/13/20