J-S56044-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| JERRY FRAZIER | : | |
| | : | |
| Appellant | : | No. 1064 EDA 2020 |

Appeal from the PCRA Order Entered February 14, 2020
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0601421-2003

BEFORE:  BENDER, P.J.E., KUNSELMAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:                    Filed: January 28, 2021

Jerry Frazier (Frazier) appeals from the February 14, 2020 order of the

Court of Common Pleas of Philadelphia County (PCRA court) dismissing his

second petition pursuant to the Post-Conviction Relief Act.[1]  We affirm.

**I.**

**A.**

We glean the following facts from the certified record.  On March 15,

2003, Jose Oquindo (Oquindo) was shot and killed outside of his house in

Philadelphia.  Earlier that day, Oquindo had argued with a male[2] who had been

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 42 Pa.C.S. §§ 9541-9546.

[2] This individual is not identified in the record.

driving a white Suburban SUV. At 11:15 p.m., shortly before the shooting, Oquindo and his fiancé, Wanda Figueroa (Figueroa), saw the white Suburban SUV drive by their house and park further down the street. Oquindo told Figueroa that he had been arguing with the man in the white Suburban SUV. He later pointed out the man to Figueroa when he saw him standing on the street corner.

Oquindo knew Frazier, whose nickname was "Man-Man," prior to the shooting. Figueroa had previously seen Frazier around the neighborhood but did not know his name. At approximately 11:30 p.m. on the night of the shooting, Oquindo and Figueroa were standing at the door to their house and looking toward the bar across the street when Oquindo pointed to Frazier and said, "That is Man-Man." Notes of Testimony, 5/4/04, at 110. They watched Frazier walk to a group of approximately ten people who were standing outside of the bar. Frazier then called out to Oquindo and asked him to come over to talk and Oquindo left the house to speak with him.

Figueroa went back inside and closed the door to the house but moments later, she heard multiple gunshots. She immediately opened the door and saw two men shooting at Oquindo as he ran back toward the house. She said that the shooters were wearing dark hoodies and one was a black male, but she was otherwise unable to identify anyone involved. She ducked down for cover while holding the door open for Oquindo, but he fell to the ground before he reached the door. Figueroa retreated into the house until

- 2 -

the shooting stopped and then went back outside, where she saw Juan Carlos Colon (Colon) holding Oquindo's body. Oquindo had sustained numerous gunshot wounds and died shortly thereafter. Figueroa did not see Frazier during or after the shooting.

Prior to the shooting, Oquindo spoke for a few minutes with several neighbors who lived across the street, including George Medina (Medina) and Colon. Medina testified that he heard someone call to Oquindo immediately before Oquindo began walking toward the bar. He did not see who had called out to Oquindo. He then heard gunshots and saw two individuals shooting at Oquindo. Medina initially told police that one of the shooters was wearing a dark hoodie and drove a white Suburban SUV and that the other shooter was dark-skinned. He had previously seen the driver of the white Suburban SUV around the neighborhood and he knew that Oquindo had been arguing with him earlier that day. However, at trial, Medina contradicted his initial statement and testified that he did not see the driver of the white Suburban SUV on the night of the shooting but had heard from someone else that he was there.

At trial, the Commonwealth played a recording of the 911 call Medina placed on the night of the shooting. The following exchange occurred:

**Q.** Is that your voice on the tape that says, "That's fucked up. Man Man[3] called him."

**A.** He didn't call him, but that's what my cousin said, but he was nowhere around.

**Q.** Who was nowhere around?

**A.** Man Man.

**Q.** But you said that —

**A**. — [Colon] told me that when he came in the house, he said that Man Man had called him to the corner, but Man Man was nowhere around.

Notes of Testimony, 5/5/04, at 28. Medina later confirmed that he did not see Frazier on the street when he drove by only a few minutes before the shooting occurred. He stated that Colon told him that Frazier had called Oquindo over from the bar, but he did not think that was possible since Frazier was not outside at the time. Medina then testified that in his police interview when he said he had seen the man who drove a white Suburban SUV, he was, in fact, only repeating what his wife and Colon had told him.

Colon was the sole eyewitness who observed the shooting in full and identified Frazier as one of the shooters. Colon knew Frazier from the neighborhood and knew that his nickname was Man Man. On the night of the shooting, Colon spoke to Oquindo outside with Medina. Contrary to Medina's

_____

[3] Medina had previously testified that he was familiar with Frazier from living in the neighborhood.

testimony, Colon testified that he saw Frazier crossing the street toward the bar as he and Medina were returning to their home. Colon then heard Frazier call out to Oquindo and say "Yo, Hose [sic], come over here." *Id.* at 74. Oquindo spoke briefly with Figueroa before walking toward Frazier. Colon followed Oquindo to the bar because he was concerned that the man Oquindo had argued with earlier that day might be in the area. He saw Frazier say to Oquindo, "What's the beef between you and my man?" *Id.* at 75.

Colon testified that Frazier then pulled out a gun and began shooting at Oquindo, and two men nearby began shooting at Oquindo as well. Colon hid behind a nearby car and watched the three men chase after Oquindo and continue shooting. Colon then saw Frazier run away from the scene in one direction while the other two shooters ran away down a different street. Colon described the two additional shooters as wearing black hoodies and he said that two shooters were Puerto Rican and one was black. Colon testified that Medina agreed at that point that Frazier was the shooter. In his statement to detectives shortly after the shooting, Colon said that "Man Man" shot Oquindo and that he had known Man Man for approximately four or five months. *Id.* at 134.

Investigators recovered 9-millimeter cartridges and 40 caliber cartridges from the crime scene. They determined that all of the 9-millimeter cartridges were fired from the same weapon and that all of the 40 caliber cartridges were fired from the same weapon. They also recovered additional

broken bullet specimens that were too damaged to determine what weapon they had been fired from. Based on this evidence, investigators could say with certainty that at least two guns were used in the shooting, though there could have been more.

Following the reception of the evidence, a jury found Frazier guilty of first-degree murder, possessing an instrument of crime and conspiracy, and he was subsequently sentenced to life imprisonment.[4]   On August 1, 2006, this court affirmed the judgment of sentence. ***Commonwealth v. Frazier***, 2682 EDA 2004, at *5 (Pa. Super. Aug. 6, 2006) (unpublished memorandum). Frazier filed a timely first PCRA petition on June 26, 2006, raising claims of ineffective assistance of counsel. The PCRA court denied the petition on August 20, 2008, and this court affirmed. ***Commonwealth v. Frazier***, 2612 EDA 2008, at *4-5 (Pa. Super. Sept. 23, 2009) (unpublished memorandum), *allocatur denied*, 641 EAL 2009 (Pa. March 22, 2010).

**B.**

Frazier filed the instant petition, his second, on January 14, 2019, asserting that he learned of an exculpatory witness statement that Darnell Thomas (Thomas) gave to detectives during the initial investigation into the shooting in 2003. He pled that his sister had spoken with Thomas in December 2018 and learned that Thomas had been present at the scene of Oquindo's

---

[4] 18 Pa.C.S. §§ 2502(a), 907, 903.

murder and had given a statement to detectives. Thomas's initial affidavit, which was attached to Frazier's *pro se* filing, read as follows:

> I was interviewed by the Philadelphia Detective(s) Homicide Unit. I was questioned about the shooting death of a man in year 2003. I was asked if I know an individual in a photo and I said, yes. He is known by the name of Man-Man. I told the detective that I know Man-Man and that I was on Phillips Street when the individual was shot and I know the person I saw running from the scene on Phillips Street was not Man-Man. The detective asked me to sign the statement and ended the interview. I will come to court to testify about this. I told Man-Man's sister to tell her brother to contact me.

*See Pro Se* Supplemental Post Conviction Relief Act Petition, 1/14/2019, Exhibit 1.

Frazier later retained counsel who filed an amended petition that included a more detailed affidavit from Thomas setting forth the circumstances of his 2003 statement to detectives:

> On or about one month following the shooting death of Jose Oquindo, I was taken from 2nd and Ontario Streets in Philadelphia, Pennsylvania by the Philadelphia Homicide Detective(s) and taken to 8th & Race Streets Philadelphia for questioning about the shooting incident. During the questioning the Police isolated me in a room by myself. The Police told me they are going to charge someone. The Police told me they were going to arrest me for my warrants. I told the Police "you are not going to charge me because I had nothing to do with this case." During the questioning, the Detectives were standing over me and yelling at me. . . .
>
> The first thing the Detectives did was ask me if I knew an individual named "Man-Man". The next thing the Detectives did was show me pictures of several individuals and asked, "which one of these pictures is Man-Man"?
>
> The Detectives asked me which one of the pictures was "Man-Man". I said, "officers I know Man-Man" and I pointed to one of

the pictures and identified "Man-Man". . . .  The Detectives then asked me if "Man-Man" was one of the shooters in the incident.  I responded to the Detectives, "No Man-Man[] was not one of the shooters".

I explained to the Detectives that I was on 2nd Street.  I quickly ran across West Moreland toward my house on 2nd Street when I heard several gun shots.  On the way to my house I saw "Man-Man" wearing a white tee shirt, capri type pants and base-ball cap standing on the corner of 2nd Street.  I did not see any weapon in "Man-Man's" hand, and he was with the "rest of the people" trying to not get shot and to get away from the situation and he ran up 2nd Street.

I also saw individuals wearing dark "hoodies" running way from the shooting like they were the ones that did the shooing. . . .

The Detectives stated to me []they would help me with my traffic violations if I told them the truth about Man-Man and the shooting incident.  I told the Detectives that "Man-Man was not out there shooting no gun."  The Police offered to "help me".  I told the Detectives my warrant has nothing to do with this case at all with Man-Man and you cannot help me with my warrants[.]  The Detectives brought up my traffic violations and threatened me with jail.

Petitioner's Amended Motion for Post Conviction Relief, 6/24/2019, Affidavit of Darnell Thomas.  Frazier also attached an Activity Sheet dated April 1, 2003, containing a detective's notes from the initial investigation into the shooting.  *Id.*, Exhibit P4.  The sheet identifies Thomas as a potential suspect in the shooting but states that Colon was unable to identify Thomas in a photo line-up.  *Id.*  Finally, he included discovery letters sent by the Commonwealth prior to trial listing witness statements and other materials that had been disclosed in discovery.  *Id.*, Exhibits P7, 8a, & 8b.  The letters do not identify any statements made by Thomas.

- 8 -

Frazier asserted that his petition was timely under the jurisdictional time-bar exceptions for interference by government officials and newly-discovered facts because he did not learn of Thomas's statement to police until December 2018. 42 Pa.C.S. § 9545(b)(1)(i), (ii). He argued that Thomas's 2003 statement to detectives during the investigation was exculpatory and was not disclosed in discovery in violation of **Brady v. Maryland**, 373 U.S. 83 (1963).[5] Frazier pled that he was entitled to relief because Thomas's statement was after-discovered evidence that had been unavailable at the time of trial and would have changed the result if it had been introduced. 42 Pa.C.S. § 9543(a)(2)(vi).

On September 23, 2019, the Commonwealth filed a response arguing that the petition was untimely and meritless. On November 26, 2019, the PCRA court issued a notice pursuant to Pa.R.Crim.P. 907 that it intended to dismiss the petition without a hearing.[6] On February 14, 2020, the PCRA court

---

[5] In **Brady**, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." **Brady v. Maryland**, 373 U.S. 83, 87 (1963).

[6] Frazier filed a *pro se* response to the notice on December 12, 2019. Because he was represented by counsel at the time, his response is a legal nullity. **Commonwealth v. Willis**, 29 A.3d 393, 400 (Pa. Super. 2011).

dismissed the petition. Frazier timely appealed, and he and the PCRA court have complied with Pa.R.A.P. 1925.

**II.**

Before considering the merits of Frazier's claim, we must determine whether his petition is timely in accordance with the PCRA's jurisdictional time-bar.[7] "A PCRA petition, including a second and subsequent petition, shall be filed within one year of the date the underlying judgment becomes final." **Commonwealth v. Graves**, 197 A.3d 1182, 1185 (Pa. Super. 2018) (citation omitted); **see also** 42 Pa.C.S. 9545(b)(1). "[A] judgment becomes final at the conclusion of direct review, including discretionary review in the Supreme Court of the United States and the Supreme Court of Pennsylvania, or at the expiration of time for seeking the review." 42 Pa.C.S. § 9545(b)(3). Because the timeliness requirements of the PCRA are jurisdictional, no court may consider the merits of an untimely petition. **Commonwealth v. Small**, 238 A.3d 1267, 1280 (Pa. 2020).

Frazier's sentence became final in 2006 when this court affirmed his judgment of sentence and he declined to seek further review by our Supreme Court. 42 Pa.C.S. § 9545(b)(3). Because he did not file the instant petition

---

[7] Whether a PCRA petition is timely filed is a question of law over which our standard of review is *de novo* and our scope of review is plenary. **Commonwealth v. Taylor**, 65 A.3d 462, 468 (Pa. Super. 2013) (citations omitted).

until January 14, 2019, his petition is facially untimely and he must plead and prove one of the exceptions to the PCRA's timeliness requirements.

To overcome the PCRA's jurisdictional time-bar, a petitioner must plead and prove one of three exceptions: that he was prevented from raising the claim earlier by government interference; that the claim is based on newly-discovered facts that could not have been ascertained earlier; or that the claim is predicated on a newly-recognized constitutional right. 42 Pa.C.S. § 9545(b)(1)(i)-(iii). In addition, the petitioner must file the petition raising the claimed exception within one year[8] of the date the claim could have been presented. 42 Pa.C.S.A. § 9545(b)(2).

Frazier asserts that his petition is timely under the exceptions for interference by government officials and newly-discovered facts. 42 Pa.C.S. § 9545(b)(1)(i), (ii). We conclude that he has satisfied the requirements of the newly-discovered facts exception and we have jurisdiction to consider the merits of his claims.

_____

[8] As of December 24, 2018, Section 9545(b)(2) states that any PCRA petition invoking a time-bar exception must be filed within **one year**, rather than 60 days, of the date the claim first could have been presented. *See* Act 2018, Oct. 24, P.L. 894, No. 146, § 2, effective Dec. 24, 2018. The amendment applies only to claims arising on or after December 24, 2017. *Id.* at § 3. Frazier's claim arises from a conversation that took place on or about December 6, 2018. *See* Petitioner's Amended Motion for Post Conviction Relief, 6/24/19, at 5. The one-year time period applies to this claim, and Frazier timely brought the claim in his *pro se* petition filed on January 14, 2019.

The newly-discovered facts exception "does not require any merits analysis of the underlying claim." **Commonwealth v. Cox**, 146 A.3d 221, 227 (Pa. 2016) (internal quotations and citation omitted). To establish timeliness pursuant to the newly-discovered facts exception, "the petitioner must establish only that (1) the facts upon which the claim was predicated were unknown and (2) they could not have been ascertained by the exercise of due diligence." **Id.** "Due diligence requires neither perfect vigilance nor punctilious care, but rather it requires reasonable efforts by a petitioner, based on the particular circumstances, to uncover facts that may support a claim for collateral relief." **Commonwealth v. Burton**, 121 A.3d 1063, 1071 (Pa. Super. 2015) (*en banc*). "Due diligence demands that the petitioner take reasonable steps to protect his own interests." **Commonwealth v. Brown**, 111 A.3d 171, 176 (Pa. Super. 2015).

Frazier claims that he was unaware that Thomas had previously made a statement to police that would potentially exonerate him. He only learned that Thomas had given an eyewitness statement related to the shooting when Thomas spoke to Frazier's sister on or about December 6, 2018. As a result, he was not aware of any potential **Brady** violation for the suppression of Thomas's statement until that time. He contends that the statement Thomas made to police constitutes newly-discovered facts for the purposes of the time-bar. He argues that immediately after learning that Thomas gave a

statement to police, he secured an affidavit from Thomas and filed the instant petition raising the claim on January 14, 2019.

The Commonwealth argues that Frazier did not act with due diligence to bring his claim because he should have been aware of Thomas long before he spoke with Frazier's sister in December 2018. It points out that the activity sheet appended to Frazier's petition proves that law enforcement had identified Thomas as a potential suspect in the shooting by April 1, 2003. The activity sheet states that detectives showed Colon a photo line-up that included Thomas's photo and Colon told them that he could not identify anyone in the line-up. The Commonwealth argues that the activity sheet was disclosed to Frazier in pre-trial discovery, so he cannot now claim that he was unaware that Thomas had given a statement or potentially been a witness to the shooting.

This argument is unavailing. The activity sheet in question states that Thomas was identified as a potential suspect by Figueroa,[9] but was not identified in a photo line-up by Colon, the sole eyewitness who had seen all three shooters together on the night in question. The activity sheet does not indicate that detectives investigated Thomas any further after Colon could not

---

[9] It appears Figueroa did not personally identify Thomas as one of the potential shooters. The activity sheet states that she was "receiving information" that Thomas was one of the shooters, but does not further identify the source or credibility of that information. *See* Petitioner's Amended Motion for Post Conviction Relief, 6/24/2019, Exhibit P4.

confirm his involvement in the shooting. It does not state that detectives spoke to Thomas or took a formal statement or even that there was additional evidence that Thomas was present during the shooting at all. The activity sheet, in fact, supports the opposite conclusion: because Colon was not able to identify Thomas in a photo line-up, detectives had no direct evidence that he had been present during the murder, either as a witness or a perpetrator.

The activity sheet would not have put Frazier on notice that he should investigate Thomas as a potential eyewitness. *Cf. Commmonwealth v. Smith*, 194 A.3d 126 (Pa. Super. 2018) (holding that petitioner did not exercise due diligence to obtain witness's affidavit when pre-trial discovery indicated that witness had made a statement to police but petitioner did not request the statement or pursue affidavit for over 13 years). We cannot conclude that due diligence required Frazier to obtain a statement from Thomas when he had no way of knowing that Thomas was an eyewitness to the shooting. Further, the affidavits present new facts relevant to the case; namely, that Thomas saw Frazier running from the scene and that he did not see a gun in Frazier's hand. Once Frazier became aware that Thomas was a witness to the shooting, he obtained an affidavit from him and timely filed the instant petition to raise his *Brady* and after-discovered evidence claims. Consequently, his petition is timely and we proceed to address the merits of his claims.

**III.**

We now consider whether the PCRA court erred in denying Frazier's petition without an evidentiary hearing.[10]  Frazier raised an after-discovered evidence claim based on a purported ***Brady*** violation, arguing that Thomas's statement to police after the shooting constituted exculpatory evidence that should have been disclosed and would have altered the outcome of the trial. In his initial affidavit attached to Frazier's *pro se* petition, Thomas averred, "I told the detective that I know Man-Man and that I was on Phillips Street when the individual was shot and I know the person I saw running from the scene on Phillips Street was not Man-Man."  ***See*** Pro Se Supplemental Post Conviction Relief Act Petition, 1/14/2019, Exhibit 1.

In his more detailed affidavit attached to Frazier's amended counseled petition, Thomas averred that he told police that Frazier did not have a gun, was not one of the shooters, and was running from the scene of the shooting with the rest of the crowd.  Petitioner's Amended Motion for Post Conviction

---

[10] "The standard of review of an order dismissing a PCRA petition is whether that determination is supported by the evidence of record and is free of legal error." ***Commonwealth v. Weimer***, 167 A.3d 78, 81 (Pa. Super. 2017). "The PCRA court's findings will not be disturbed unless there is no support for the findings in the certified record." ***Id.*** (citation omitted). "[A] PCRA court has discretion to dismiss a PCRA petition without a hearing if the court is satisfied that there are no genuine issues concerning any material fact; that the defendant is not entitled to post-conviction collateral relief; and that no legitimate purpose would be served by further proceedings." ***Commonwealth v. Brown***, 161 A.3d 960, 964 (Pa. Super. 2017) (citations omitted).

Relief, 6/24/2019, Affidavit of Darnell Thomas. He further stated that he saw two individuals in dark clothing running from the scene "like they were the ones that did the shooing [sic]." *Id.* Frazier argues that Thomas's affidavits establish that he gave a statement to police shortly after the shooting that was exculpatory and disclosable under ***Brady***. He argues that the Commonwealth violated ***Brady*** when it failed to disclose Thomas's statements in discovery, as the statements constitute substantive eyewitness evidence that he was not one of Oquindo's assailants.

A petitioner is entitled to relief on an after-discovered evidence claim if he pleads and proves that his conviction resulted from "[t]he unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been produced." 42 Pa.C.S. § 9543(a)(2)(vi).

> A petitioner must establish that the evidence: (1) could not have been obtained prior to the conclusion of the trial by the exercise of reasonable diligence; (2) is not merely corroborative or cumulative; (3) will not be used solely to impeach the credibility of a witness; and (4) would likely result in a different verdict if a new trial were granted.

***Commonwealth v. Epps***, 240 A.3d 640, 653 (Pa. Super. 2020) (emphasis and citation omitted). Moreover, the Commonwealth violates ***Brady*** when it fails to disclose evidence in its possession that is favorable to the defendant, whether exculpatory or impeaching, including evidence that is located in police files of the government bringing the prosecution. ***Commonwealth v.***

- 16 -

*Carson*, 913 A.2d 220, 244-45 (Pa. 2006). A PCRA petitioner who raises a

*Brady* claim must plead and prove

> (1) the prosecutor has suppressed evidence; (2) the evidence, whether exculpatory or impeaching, is helpful to the defendant; and (3) the suppression prejudiced the defendant. . . . In the PCRA context, a petitioner must demonstrate that the alleged *Brady* violation so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.

*Commonwealth v. Smith*, 17 A.3d 873, 887-88 (Pa. 2011) (cleaned up). To

meet his burden, Frazier must plead and prove that he was prejudiced because

Thomas's statements were not available to him at the time of trial and that

the outcome of the trial would have been different if Thomas had testified. As

we conclude that Thomas's statements would not have compelled a different

verdict, no relief is due.

Importantly, the affidavits do not state that Thomas witnessed any part

of the actual shooting. Thomas only avers that he saw various individuals,

including Frazier and other bystanders, running away from the scene of the

shooting after the fact. Colon testified at trial that Frazier ran in one direction

after the shooting while the other two shooters ran down a different street.

Figueroa also stated that she saw two individuals in dark clothing shooting at

Oquindo, but she did not see the beginning of the shooting and did not see

Frazier during the shooting. This testimony is consistent with Thomas's

affidavit, in which he averred that he saw two shooters in dark hoodies running

together after the shooting while Frazier ran away separately. While Thomas

apparently believed and told investigators that Frazier was not one of the shooters, the only eyewitness testimony he provided was that Frazier ran away alone after the shooting and he could not see a gun in Frazier's hand. This testimony was not inconsistent with the testimony of Colon, who witnessed the shooting itself.

The evidence at trial established that Oquindo had told Figueroa and Colon that he had been arguing with an unidentified male who had driven down the street shortly before the shooting. Oquindo identified Frazier to Figueroa minutes before the shooting when he saw Frazier walking toward the bar, and Colon had known Frazier from around the neighborhood for approximately four months. Both Figueroa and Colon testified that they heard Frazier call over to Oquindo and ask him to come over to the bar immediately before the shooting occurred.[11] Figueroa and Colon both testified that they were concerned for Oquindo when he left the house because they knew he had argued earlier that day with someone in the neighborhood. For that reason, Colon followed Oquindo to the bar, where he heard Frazier say "What's the beef between you and my man?" Notes of Testimony, 5/5/04, at 75. The Commonwealth's theory at trial was not only that Frazier participated in the

---

[11] Medina also testified to hearing someone call Oquindo over to the bar but stated that he did not see Frazier outside that night. He further testified that he initially told investigators that he saw Frazier at the shooting but had, in fact, only heard of Frazier's involvement from his wife and Colon.

shooting itself, but also that he lured Oquindo away from the safety of his house to facilitate the shooting for the other individuals involved.

As the PCRA court noted in its opinion, Colon was the only witness to the shooting who saw all three assailants shooting at Oquindo at the same time and he positively identified Frazier as one of the shooters. Opinion, 6/23/2020, at 4-5. He and Figueroa both witnessed Frazier call Oquindo over to the scene of the shooting immediately before it occurred, and Colon heard Frazier ask Oquindo about an argument he had earlier that day with a third party. Thomas's affidavit merely corroborates Colon's testimony that Frazier separated from the other two shooters when fleeing the scene and does not undermine Colon's eyewitness account of the shooting itself. The record supports the PCRA court's determination that this after-discovered evidence would not have altered the outcome of Frazier's trial. No relief is due.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/28/21